## THE STATE v. STEPHENS, *Appellant.*

1. **Practice, Criminal:** WITHDRAWAL OF EVIDENCE: INSTRUCTION. In a criminal prosecution, where all evidence offered by the defendant to establish his insanity had been stricken out at his request, it was proper for the court to instruct the jury that there was no evidence authorizing an acquittal on that ground.

The State v. Stephens.

2.  **Appellate Practice :** PRESUMPTION IN FAVOR OF CORRECTNESS OF RECORD. The supreme court will presume that a bill of exceptions was read by the judge before he signed it, and that all corrections of it, if any occurred, were made with his knowledge and before the act of signing.

3.  **Practice, Criminal:** MURDER : DELIBERATION : INSTRUCTION. An instruction that " deliberately " means " in a cool state of blood, that is, not in a heat of passion caused by some just cause or provocation to passion " is not erroneous in a case where the only provocation was the application of opprobrious words, and other instructions, in effect, declare that such words are capable of eliminating deliberation from the homicide and amounting to just provocation, and that with the element of deliberation left out, the offense would be murder in the second degree.

4.  **Criminal Law:** DYING DECLARATIONS. Dying declarations made in the face of impending death, after the declarant had been fully informed of his condition and fully understood his situation, are admissible in evidence.

5.  **Defenses in Criminal Prosecution:** CASE STATED. The defendant in his own behalf, testified that the shot which killed deceased was fired accidentally and wholly without design, and that he had no occasion to kill the deceased, and did not kill him because of any apprehension of danger. Other than defendant's testimony, there was no evidence of self-defense in the case. Besides the usual instructions, the trial court instructed the jury that there was no " evidence that will warrant an acquittal on the ground of self-defense." *Held* that grievous and prejudicial error was committed by the trial court in refusing to permit evidence of threats, etc., and in refusing to instruct the jury upon the theory of self-defense, and that under a plea of not guilty entered to a charge of murder, the defendant may rely upon the plea of self-defense even though contradictory of his own testimony. ( SHERWOOD, J., dissenting as to last paragraph.)

*Appeal from Jackson Criminal Court.*—HON. HENRY
P. WHITE, Judge.

REVERSED AND REMANDED.

*John F. Waters, F. W. Griffin, F. M. Hayward* for appellant.

The court erred in the definition of murder in the first degree and, particularly, in the definition of the word "deliberately," when distinguishing between murder in the first degree and murder in the second degree. *State v. Ellis*, 74 Mo. 207; s. c., 11 Mo. App. 587; *State v. Lewis*, 74 Mo. 222; *State v. Weiners*, 66 Mo. 13; *State v. Curtis*, 70 Mo. 594; *State v. Sharp*, 71 Mo. 218; *State v. Simms*, 71 Mo. 538; *State v. Robinson*, 73 Mo. 306; *State v. McGinnis*, 76 Mo. 362; *State v. Rose*, 14 Mo. App. 567; *State v. Eaton*, 75 Mo. 586.

*B. G. Boone*, Attorney General, for the State.

(1) Declarations of deceased, reduced to writing, read to the deceased and by him approved, signed and sworn to, were admissible. Whar. Cr. Ev. [9 Ed.] sec. 295. The instructions are all in the forms approved by this court except the instruction defining the word "deliberately." It is as follows: "Deliberately, for the purpose of this trial, means in a cool state of blood, that is, not in a heat of passion, caused by some just cause of provocation to passion." This was a harmless error, as there was no evidence of any provocation. The instruction in the form above is held not to be reversible error unless there is some evidence of provocation. *State v. McGinnis*, 76 Mo. 326.

SHERWOOD, J.—The defendant was indicted for murder in the first degree. The charge in the indictment was that he shot and killed one Thomas Kelly in Kansas City, Missouri, on the fourteenth day of July, 1887. In January, 1888, he was tried, convicted as charged, and appealed to this court.

The testimony and evidence on the part of the state, is substantially as follows: Defendant was employed

in a shooting-gallery in Kansas City, Missouri. On the evening of the fourteenth day of July, 1887, the deceased, with whom the defendant had been acquainted about a week, came to the gallery and picked up the gun and took aim as if he was going to fire at the target. Defendant cursed him and told him to put the gun down. He did so, and went away a few steps and sat down. Defendant, who had been back near the target, came up nearer the deceased, and they continued to bandy words with each other. Defendant called deceased a son-of-a-bitch, and the latter arose from his seat and stepped towards defendant, laughing as he did so. The witness who saw this says she thought the deceased was joking the defendant, who got a little angry about it. Just at this juncture the gun in the hands of defendant was discharged by him without being raised to his shoulder, and the deceased was shot through the abdomen, the bullet ranging downward and inward, passing through the stomach and the folds of the small intestines below the stomach, thence into the back to the right of the spinal column, where it lodged in the muscles. This wound was necessarily fatal, and the wounded man died from the effects of it at the city hospital in Kansas City at eleven o'clock on the night of July 15, 1887. The deceased was a spare-built, boyish-looking man, twenty-two years of age.

The coroner, who is a physician, testified that the gun must have been held when the fatal shot was fired so as to cause the ball to range downward and backward. As soon as the defendant fired the shot he ran across to a house on what is called Bank street, and going into a room, locked the door. An officer followed him, and was about to force an entrance into the room, when it was opened by a woman, and the officer found defendant changing his clothes, he having had on a buckskin suit and was taking it off and putting on citizens' clothes. Just as the officer stepped into the room the defendant threw the gun under the bed, and said

that he would go along if the officer would protect him from the mob. There was no evidence of any unlawful demonstration by any one against the defendant. The officer says as they were starting to the station-house, he said to defendant, in reference to the shooting, "What in the name of God did you mean?" To which defendant replied, "I meant to kill the son-of-a-bitch; is he dead?"

Defendant, as well as the deceased, were taken to the police station, where defendant was identified by deceased as the man who shot him. The deceased, while at the station, made the following statement: "My name is Tom Kelly; my age is twenty-two years; my residence is 2710 Market street, St. Louis, Mo. Believing I am about to die, I make this statement on oath: He called me a son-of-a-bitch and I walked towards him and he picked up a gun and said, 'I will kill you; you are a son-of-a-bitch,' and then he shot me; he then ran away; the party to whom I refer is named Jeff. Stephens; I have known him about one week; he is the man who shot me; in the presence of Capt. Charles Ditsch and Officer Nichols I fully recognize the man that is held under the charge of shooting as the right man." This was signed and sworn to by the deceased, and witnessed by the two officers present.

The testimony of the defendant is as follows: "Kelly came there between five and six o'clock in the evening. He picked up a gun. I was back at the target. He pointed the gun in that direction and I said, 'Lay that gun down.' He said, 'I want to shoot.' I told him it was no benefit to me to have him shoot. He laid the gun down, and said to me, to go to hell. He said, 'Go to hell, you son-of-a-bitch,' and went around and sat down on a chair or something outside the tent. There was a table close to the end of the counter on which there was a thirty-eight caliber Remington revolver, belonging to one Denny. Denny was writing a letter at the table.

Kelly kept up the conversation after he had sat down—called me a son-of-a-bitch again, and I said you are another one. He then said, 'I have had it in for you and I will fix you now.' At the time I was fixing a gun for a customer, standing at the counter. He advanced towards me, saying that he would fix me, etc., a distance of eight or nine feet, and I threw the gun up in my hand like this (indicating). I said, 'Stay out of here,' and undertook to load the gun; the extractor bound too tight on the cartridge and set it off. I did not put the gun to my shoulder nor did I take aim. At the time I shot, deceased could have reached the revolver with his hand. The gun has gone off accidentally two thousand times. The extractor binds up tight on the cartridge. It is a rim-fire; the hammer strikes on the rim. If it was a center-fire it would not do that. I judge Kelly to have been six feet in height and to have weighed between one hundred and sixty-five and seventy pounds. After the gun went off Kelly ran out of the tent; he said, 'You son-of-a-bitch, I will get my gang and fix you,' and then I got scared and run over to Smith's house. There were two or three circus fellows, I believe, standing there at the time.''

The following questions were then asked defendant by his counsel:

Q. "Why did you shoot Kelly?" A. "Because the gun went off accidentally."

Q. "Well what occasion had you for shooting him?" A. "No occasion."

Q. "Were you afraid of Kelly?" A. "Well I was afraid of him, but I did not shoot him because of that."

Q. "Had the deceased ever threatened you prior to that time?" But, the court of its own motion, refused to permit the testimony.

On cross-examination, defendant testified that the gun went off accidentally.

Q. " You were not shooting him because he called you a son-of-a-bitch?" A. "No, sir."

Q. "You did not kill him because he was advancing on you?" A. "No, sir."

Q. "What did you think of it?" A. "I thought it was wrong."

Q. "When this shot went off, did you shoot him because he was advancing on you?" A. "I shot him because the gun went off accidentally in my hand; it wasn't my fault."

Q. "You were not defending yourself at that time?" A. "No, sir."

Q. "There was no necessity?" A. "There might have been a necessity."

Q. "The necessity hadn't arisen at the time of you shooting him, so that you had to shoot him in self-defense?" A. "No, sir. I had no cause to shoot him at the time."

Q. "You have said all that took place between you at this time?" A. "Yes, sir; at the present time."

Miss Mamie Hughes' account is, that as she was coming from the Tivoli Hotel with a market-basket she saw a lady standing on the sidewalk, and two men quarreling in there (the shooting tent). "I saw this man sitting in the chair. He got up and made a remark to this man in a laughing manner and the fellow was standing there with the gun in his hand. He had a buck-skin suit on. He didn't raise the gun with an aim, but shot. If he had raised it, I would have seen him do it. He shot without having the gun raised. Kelly raised from the chair and had taken one or two steps towards this gentleman when he told him to stop. He was six or eight feet away."

Q. "What was Kelly doing at the time this man shot him?" A. "He had just risen out of the chair and stepped towards this gentleman when this gentleman said, 'You keep back.' The defendant was

standing at the end of the counter. Mr. Stephens, the defendant, was looking very pale, whether it was from madness or fear, I can't say."

This was the testimony of the eye-witnesses as to the shooting. It was also shown by other testimony that the gun used, or one like it, would "go off" accidentally. It appeared also, from the testimony of several witnesses, that defendant would have spasms ; had tried to kill himself and his mother ; had hallucinations ; told wild and improbable stories, etc.

Just before the close of the testimony, there appears in the bill of exceptions, the following statement : "At this point, the state began to call witnesses to rebut the testimony relative to the mental condition of defendant, whereupon the court, at the request of the defendant, struck out all the evidence introduced by the defendant upon that subject and thereupon the state refrained from offering further testimony."

The testimony being closed, the defendant asked the court to give the following instructions :

"1. If you believe from the evidence that the defendant, Jefferson Stephens, had reasonable cause to apprehend a design on the part of deceased to commit a felony upon him, or do him some great personal injury, and that there was a reasonable cause to apprehend immediate danger of such design being carried out, and he shot and killed deceased to prevent the accomplishment of such apprehended design, then the killing is justified upon the ground of self-defense, and you should acquit. It is not necessary to this defense that the danger should have been real and actual, or that the danger should have been impending and immediately about to fall. If you believe that the defendant had reasonable cause to believe these facts and he shot under such circumstances, as he believed, to prevent such expected harm, then you should acquit.

"2. To constitute the right of defense, the actual

striking of a blow is not necessary nor that the assailant be in striking distance.

"3. If you believe from the evidence, that the defendant used the tent referred to in evidence as a place in which to lodge himself at night, then the court instructs you it was his home or habitation and as such was sacred for his protection. A person assailed in his own house is not bound to retreat out of it or to secrete himself to avoid violence. If you find from the evidence that at the time the killing occurred deceased was entering the tent for the purpose of feloniously assaulting defendant, or, at said time, defendant had reasonable ground to apprehend immediate danger to his person, and he shot under such circumstances to prevent such apprehended felonious assault or immediate danger to his person, the killing is excusable and you should acquit."

These instructions the court refused to give, and gave of its own motion the following:

"The indictment in this cause was filed on the twelfth day of September, 1887, and charges the defendant with murder in the first degree. According to the evidence adduced, however, it will be necessary for you to determine, in case you find the defendant guilty of any offense, whether the conviction should be had for the specific offense charged, or for murder in the second degree, or for manslaughter in the fourth degree. Murder in the first degree, is the killing of a human being, wilfully, deliberately, premeditatedly and with malice aforethought. Murder in the second degree has all the elements of murder in the first degree, excepting that of deliberation. Manslaughter in the fourth degree, for the purpose of this trial, is the killing of a human being, through culpable negligence. As used in defining murder, wilful means intentional, as contradistinguished from accidental. Deliberately, for the purpose of this trial, means in a cool state of blood, that is, not in a

heat of passion, caused by some just cause of provocation to passion.    Premeditatedly means thought of beforehand any length of time, however short.    Malice does not mean spite or ill-will, but signifies an unlawful state of the mind, such a state of mind as one is in when he intentionally does an unlawful act.    Malice aforethought means malice with premeditation, *i. e.*, that the unlawful act intentionally done was determined upon before it was executed.    As used in defining manslaughter in the fourth degree, 'culpable negligence' signifies that the person by whose act a death was caused, was utterly indifferent to the rights of others and the security of human life.

"Bearing the foregoing in view, and considering it as a basis, the court submits to you the further instructions following, to-wit:

"1.    If you should believe and find from the evidence that at the county of Jackson, state of Missouri, any time prior to the day on which the indictment was filed, the defendant, Jefferson Stephens, in the manner and by the means specified in the indictment, shot and wounded the deceased Thomas Kelly, and shall further believe that such shooting was done wilfully, deliberately, premeditatedly and with malice aforethought, and shall further believe that within one year and a day thereafter, and before the filing of the indictment in this case, the deceased Thomas Kelly, at the county of Jackson aforesaid, died, in consequence of such shooting and wounding done by the defendant, you will find him, the defendant, guilty of murder in the first degree.

"2.    If you shall believe and find from the evidence that within the time and at the place specified in the preceding instruction, the defendant in the manner and by the means specified in the indictment, shot and wounded the deceased Thomas Kelly, and shall further believe that such shooting and wounding was done wilfully, premeditatedly and with malice aforethought, but without deliberation, and shall further believe that within

one year and a day thereafter and before the filing of the indictment the deceased Thomas Kelly died from the effects of such shooting and wounding at the county aforesaid, you will find the defendant guilty of murder in the second degree.

"3. You will observe from the foregoing instructions, that deliberately means in a cool state of blood, that is, not in a heat of passion caused by some just cause or provocation to passion. If, therefore, you shall believe that at the time of the shooting (provided the defendant did shoot) he, the defendant, was so far under the dominion of passion in consequence of opprobrious epithets applied to himself; or because of offensive or insulting or degrading language addressed to himself by the deceased, as to be unable to judge rightly as to the nature, quality and consequences of his act, you cannot find that the shooting was done with deliberation.

"4. If you shall find and believe from the evidence that at the county of Jackson, state of Missouri, any time within three years next before the day on which the indictment was filed, the defendant shot and wounded the deceased Thomas Kelly, and shall further find and believe that within one year and a day thereafter, at the county aforesaid, he, the said Kelly, died from the effects of such shooting and wounding, and shall further believe that such shooting was the result of culpable negligence on the part of the defendant, you will, although you may believe that the gun was accidentally or unintentionally discharged, find the defendant guilty of manslaughter in the fourth degree.

"5. If you shall believe and find that the wound that occasioned the death of Thomas Kelly was the result of misadventure or the accidental or unintended discharge of a gun, you cannot find the defendant guilty of murder in either degree, and you cannot find him guilty of manslaughter in the fourth degree, unless you shall find that the defendant was culpably negligent as heretofore stated to you."

At the request of the prosecuting attorney the court also instructed the jury that:

"6. In contemplation of law there is no evidence before you authorizing you to acquit the defendant on the ground of insanity. Nor is there any evidence that will warrant an acquittal on the ground of self-defense.

"7. You are sole judges of the credibility of the witnesses and the weight of their testimony; and if you believe that any witness in the cause has sworn wilfully falsely, or to any material fact or matter testified to by such witness, you are at liberty to disregard or treat as untrue the whole or any part of such witness' testimony.

"8. Under the law, the defendant is a competent witness in his own behalf, and you should take his testimony into account and give it such weight as you deem it entitled to receive in passing upon his guilt or innocence. But in determining what weight you will attach to his testimony you may take into account the fact that he is the defendant in the cause testifying in his own behalf.

"9. If upon the evidence considered as a whole, the jury entertain a reasonable doubt of defendant's guilt, you should give him the benefit of such doubt and find him not guilty; but a doubt to authorize an acquittal on that ground alone should, as stated, be a reasonable doubt, and one fairly arising from the evidence taken and considered as a whole; the mere possibility that the defendant may be innocent will not warrant you in acquitting him on the ground of reasonable doubt.

"10. If you find the defendant guilty of murder in the first degree, you will simply so state in your verdict; you are charged with no responsibility with respect to the punishment for murder in the first degree. If you find the defendant guilty of murder in the second degree, you will so state in your verdict and assess his punishment at imprisonment in the state penitentiary for any term, not less than ten years, that may to you seem proper. If you find the defendant guilty of manslaughter in the

fourth degree, you will so state in your verdict and assess his punishment at two years in the state penitentiary, or at imprisonment in the county jail not less than six months, or at a fine not less than five hundred dollars, or at both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

"11. As to whether the shot which occasioned the death of deceased, Thomas Kelly, was or was not accidentally discharged, you are to determine from all the facts and circumstances proven before you, including in connection with these facts and circumstances any statement you may believe the defendant made relative to this shooting. And, in this connection, the court instructs you that what a person accused of crime says against himself is presumed to be true, because contrary to self-interest. But you must take into account all he says in favor of himself, and give it such weight which you may believe it entitled to receive according as you may believe it to be true or false.

"12. The statement read to you as the dying declaration of the deceased must be considered and treated by you as a dying declaration of said Kelly; but because it is a dying declaration you are not bound to believe it; you may believe it or disbelieve it as you deem proper, considering all the facts and circumstances proven, and also the court further instructs you that you are to give such declaration such weight in connection with all the other facts and circumstances proven as you deem proper."

I. The action of the court in giving the sixth instruction, that there was no evidence in the cause authorizing an acquittal on the ground of insanity, was undoubtedly correct when the foregoing statement in the bill of exceptions in reference to insanity and the withdrawal of all testimony respecting it, by the defendant, is considered. All evidence respecting insanity having been stricken out at the defendant's

request, the court could do no less than it did do, in giving such an instruction.

II.   But in reference to the statement in the bill of exceptions already referred to, counsel for defendant say that it was "*mysteriously interpolated into the record.*" Of this, we can know nothing except from the record as we find it.   We are bound to presume that the bill of exceptions was read by the judge before he signed it, and that all emendations of that bill, if any occurred, were made with his knowledge and before the act of signing took place.

III.   The instructions, speaking of them generally, were properly worded and placed the matters arising upon the testimony fairly before the jury.   The theory of the state was that the act of the defendant was intentional ; the theory of the defendant that it was accidental.   Instructions covering these different theories were given, ranging from murder in the first degree, down to murder in the second degree, manslaughter in the fourth degree and homicide by misadventure.   It is claimed, however, that material error occurred in defining the meaning of the word "deliberately."   Looking at the instruction where this word is first used, and to which reference is made in the third instruction, it is not thought that the jury could have been misled, or the defendant prejudiced.   In *State v. Ellis*, 74 Mo. 207, if we understand that case, the doctrine is laid down that in order to reduce what could otherwise be murder in the first degree to manslaughter, there should be a "*lawful*" or "*reasonable*" provocation, as *ex. gr.*, a blow ; but that in order to reduce what would otherwise be murder in the first degree, in order to eliminate from it the element of deliberation and bring it down to murder in the second degree, grievous and degrading words of reproach would amount to "*just provocation,*" as contradistinguished from *lawful* and *reasonable* provocation.   Here the jury were in effect told in the third instruction that the use of such opprobrious

words was capable of robbing the homicide of delibera-
tion, and by reason of doing so, amounting to *"just
provocation."* And by the second instruction the jury
were told that with the element of deliberation left out
of the case, the offense would be murder in the second
degree, thus bringing this case fully within the rule
laid down in *Ellis' case, supra.* How there could be a
*"just provocation,"* which is neither *"lawful"* nor
*"reasonable,"* seems difficult to understand. But at all
events, it does not lie in the mouth of the defendant to
complain of an instruction which evidently lessens the
amount of provocation necessary to exonerate him
from the commission of the highest grade of homicide.

IV. Before making his statement, the deceased
was fully informed as to his condition, and fully under-
standing his situation, he made his declaration. No
error occurred on this point.

V. Under the plea of not guilty, every defense of
whatsoever nature, whether self-defense, insanity, mis-
adventure, *alibi,* etc., are open in criminal proceedings
to a defendant, and whereof he can avail himself,
whether such defenses are consistent with each other or
not ; and it is wholly beyond the power of the trial
court to limit or hamper him in the slightest degree in
the particulars aforesaid. In a word, we hold that the
power of the accused to defend, must necessarily be as
broad as that of the prosecution to criminate ; and that
this right of defense, broad as it is, is not narrowed or
restricted by reason of the fact that the defendant places
himself upon the stand and testifies as a witness. So
holding, we of necessity rule that grievous and preju-
dicial error was committed by the trial court, in refus-
ing to admit evidence of threats, etc., and in refusing
to instruct the jury on the theory of self-defense.

NORTON, C. J., and BLACK and BRACE, JJ., hold
that for the errors heretofore pointed out, the judgment
should be reversed and the cause remanded, in which

reversal I do not concur, but express my views in a separate opinion.

SHERWOOD, J. (*dissenting*).—It seems to me that the action of the trial court was correct in informing the jury in the sixth instruction given at the instance of the state, that there was no evidence that would warrant an acquittal on the ground of self-defense. The testimony of the defendant on this point is too plain to admit of any mistake. *The idea of self-defense must obviously originate with the defendant himself, and rest exclusively upon the motive which prompted him to do the act subsequently charged as criminal.* If he had *no intention, no motive* for doing the act ; if it was *purely accidental,* then without doubt the action of the court in instructing the jury on this point as it did, must stand confessed as free from error. *An act done in self-defense is a positive, intentional act, not an unintentional one, not a mere accident. Accident and intention cannot be affirmed of one and the same act. State v. Gilmore,* 95 Mo. 554.

He who acts in self-defense, must see with his own eyes and hear with his own ears ; he must be judged from his own standpoint. He must act upon appearances ; act upon facts as they appear to him and not as they appear to others. *State v. Sloan,* 47 Mo. 604 and cas. cit.; 1 Bish. Cr. Law, sec. 305 ; 2 Bish. Crim. Proc., sec. 610. His peril may be imminent ; his situation dangerous ; it may excite great apprehension in the breasts of other witnesses to the transaction, and yet he himself may be wholly ignorant of his danger and unconscious of his peril. If in such circumstances, he should unintentionally slay his adversary, it would be a perversion of terms to say his act was one done in self-defense. And according to defendant's own testimony, his situation and his acts were precisely similar to those in the case instanced. According to his own story, he

was without apprehension of danger, and without consciousness of fear when he did the act now called in question. And there was, in the view I take of the matter, not a particle of testimony from any other witness, tending to support the theory or necessity of self-defense. The record is barren of any necessity for such defense.

Granting the testimony of the defendant is true, and so it must be taken, that there was a loaded revolver on the table at the end of the counter at which defendant was standing, it does not appear that deceased attempted to reach the revolver, though the defendant swears deceased could have reached it with his hand. He could have reached it, but did not attempt to do so. Where, then, is there any basis laid for self-defense? I have always thought that before an act of homicide is justifiable by one on the ground of self-defense, his danger must be imminent, not of a mere battery, but of death or great bodily harm, and that danger must be manifested by some overt act. See *State v. Gilmore, supra; State v. Tabor*, 95 Mo. 585, and cas. cit.

The foregoing remarks also sanction the action of the lower court, in refusing to admit testimony of threats. *State v. Taylor*, 64 Mo. 358 ; *State v. Clum*, 90 Mo. 482 ; *State v. Alexander*, 66 Mo. 148 ; 1 Bish. Crim. Proc., sec. 620. As there was no motive and no intent on the part of the defendant, who of course knew his own motives and intentions to do the act which he did do, as his act was unintentional, this rules the theory of self-defense out of the case ; and such a theory is also ruled out by the very pertinent reason that there was no testimony, extraneous of that of defendant, to support it.

I am constrained, therefore, to dissent from the judgment of reversal announced herein.