The State v. Smith.

---

THE STATE v. SMITH, *Appellant*.

Division Two, February 28, 1893.

1. **Criminal Law**: MURDER: PRACTICE: INSTRUCTION FOR LOWER GRADE OF CRIME. On a trial for murder, where the testimony for the state shows a deliberate and premeditated homicide and that for the defense a clear case of self-defense, instructions should not be given for a lower grade of homicide than murder in the first degree.

2. ———: ———: SELF-DEFENSE: INSTRUCTIONS. A series of instructions on murder of the first degree and self-defense approved.

3. ———: ———: ———: ———. Self-defense is an affirmative, positive, intentional act, and an instruction on a trial for murder, that, if the defendant "fired the shot at random, then the jury shall find that the said shot was fired in self-defense" is erroneous and should not be given. (*State v. Stephens, 96 Mo. 637, overruled.*)

4. ———: PRACTICE. A conviction in a criminal trial will not be disturbed on appeal, upon the ground that a witness for the state testified falsely as to a matter material to the issue, where the verdict of the jury as to such matter was abundantly sustained by the testimony of other witnesses, and where even if the testimony of the witness complained of were altogether rejected, it would not have changed the result.

5. ———: ———: IMPANELING JURY. Where no objection is made or exception saved to the method of summoning and impaneling a jury, it will be too late to do so for the first time in the motion for a new trial.

6. ———: ———: MOTION FOR NEW TRIAL: EXCEPTIONS. The statement in the motion for new trial, that the court threatened to exclude defendant's testimony from the jury and that it instructed the jury orally as to the manner in which the jurors might conduct themselves, will not be noticed on appeal, even if erroneous, where no exception was saved thereto and nothing with reference to it preserved in the bill of exceptions.

7. ———: ———: ———: ———. Facts stated in a motion for new trial are not proved by the motion itself. They must be preserved in the bill of exceptions or be otherwise proved.

8. ———: ———: EXCEPTIONS. The complaint on appeal, that a defendant was allowed to remain shackled after the commencement of the trial, cannot be supported by *ex parte* affidavits. The only way in which matters occurring in the presence of the court can be preserved is by incorporating them in the bill of exceptions.

9. ———: EVIDENCE: SELF-SERVING ACTS. On a trial for murder, evidence that, after the homicide, the accused offered to surrender himself is not admissible because a self-serving act.

10. ———: ———: IMPEACHMENT: HEARSAY. Evidence as to what a witness had told another contradictory of his testimony cannot be proved by such other to impeach the witness, where no foundation was laid, as in such case it would be hearsay.

11. ———: ———. The refusal of the court to allow a question to be answered constitutes no error where substantially the same question was afterwards asked and answered by the same witness.

12. Practice in Supreme Court: OBJECTION TO EVIDENCE. The ruling of the trial court in admitting evidence will not be reviewed on appeal, unless the specific ground of objection to it is stated at the time.

13. Practice, Criminal: MOTION FOR NEW TRIAL. A motion for new trial, based upon the ground of newly discovered evidence, should be denied, where it tends merely to impeach the credit or character of a witness.

The State v. Smith.

*Appeal from Jackson Criminal Court.*—HON. JOHN W. WOFFORD, Judge.

AFFIRMED.

THE defendant, a negro, indicted for the murder of one of his own race, George Cameron, by shooting him with a pistol, being put upon his trial, was found guilty of that offense in the first degree, and judgment having been rendered on the verdict and sentence passed upon him, he appeals to this court.

The indictment is in due form and the verdict complies with the law in specifying the degree of the crime of which the defendant was found guilty. No assignment of errors has been made, nor is there any brief of counsel filed on behalf of defendant, though time was granted by this court for that purpose. But it is the statutory duty of this court, even though no assignment of errors be made or brief filed in a criminal cause, to render judgment on the record before us. Revised Statutes, 1889, sec. 4297.

Engaging in the performance of this statutory duty, we find many grounds stated in the motion for a new trial which will hereafter be discussed or else noticed in a manner sufficient for the purposes of the present investigation. With this end in view, the record has been carefully read. As will presently appear there is considerable conflict in the testimony.

The defendant's version of the affair is in substance as follows: "Between twelve and one o'clock I met Jim Cameron, George Cameron, Tim Jackson and Mr. Knauer in Knauer's saloon; that, as soon as I went in, George Cameron said, 'I am here yet, you black son of a bitch,' and I said, 'that is all right;' the first trouble started over money; Jim Cameron and George were shaking dice and asked me to hold the stakes, which I

did, and the quarrel commenced between me and George Cameron; after the fuss commenced I walked outside the saloon and went home; I returned to the saloon in an hour or an hour and a half, where I met the same parties; as soon as I went in Cameron said, 'I am here you black son of a bitch;' I replied to him that I had as good a right there as anybody, if I behaved myself; then Knauer said, 'get out of the saloon, I will have no fussing here; this is Sunday;' I went outside, and was there an hour or an hour and a half before they came out; when they came out they said, 'where did he go?' Cameron made the remark 'I don't know;' Tim said, 'less find him and knock him in the head;' Cameron said, 'I will fix him;' then I stepped out of the barn and asked, 'what do you want out here?' and then went in the saloon; my little boy was there, and as I was going in the saloon called me and said, 'why don't you make up with the Camerons?' I replied that I would make up with them if they were willing to do it; with that Cameron said he would knock my brains out rather than make up with me; Jackson said he would do it; I staid out doors about half an hour, or maybe an hour; then they came back in the saloon where I was; they commenced on me again, and I went out in the back yard; at the time the shooting took place George Cameron had hold of the gun, and was going to kill me with it, at least he said he was; just prior to the shooting George Cameron grabbed the gun and said, 'give me the gun, I will kill the black son of a bitch; the two Camerons and Jackson and this man Best and myself were in the back yard; Best was there just a little while before the shooting took place; Jim had the gun at this time; George had the gun when I fired; Cameron fell at the crack of the pistol, and I ran; I saw Jim after me with a shotgun; he followed me one hundred yards past the ele-

vator; at the time I fired that shot I believed that they were going to shoot me; I mean by 'they,' George Cameron; I went to Boonville after the shooting; the reason I went there was that I was scared; before the shooting I had everything packed up to go there; my family was all there except one boy; during the difficulty Tim Jackson had a soda-pop bottle in his hand; he said he would knock my head off.''

On cross-examination defendant said: ''I remained in the back yard an hour or an hour and a half after leaving the saloon, before the Camerons and Tim Jackson came out; the first thing I heard them say after they came out was when George grabbed the gun to shoot me with, George said, 'give me this gun and I will kill that black son of a bitch;' that all took place when he grabbed the gun; this was not the time that Tim Jackson had the soda-pop bottle; that was another time when they came out; they came out twice together; when they came out the first time Tim had the bottle in his hand, and they looked for me when I was sitting in the shed; they could have seen if they had come out there; that is when they said, 'where is that black son of a bitch? where did he go?' and Tim said, 'less find him,' and George said, 'I will fix him;' then I came out and said, 'what are you fellows following me for?' They said, 'if you want a fight you can have it;' I said, 'I don't want to fight;' they kept on talking and I went in the saloon, and Tim said to my little boy that he would make up with me, and threw down the soda-pop bottle; neither had the shotgun at that time; after I went in the saloon it was fifteen or twenty minutes before they came in; I went out of the saloon again; this was the last time I was in the saloon; George and Jim came out again; this was the time they had the gun; Tim Jackson followed them; George grabbed the gun and said, 'I will shoot that black son of a

bitch;' just as he grabbed the gun I' shot; Jim slung George away from him; I did not shoot when George said 'give me the gun,' and grabbed it; these men were not laughing when they were scuffling over the gun, and I did not laugh; George grabbed the gun and jerked it loose from Jim and aimed it at me, and then I shot him.

The testimony of the defendant sufficiently outlines and indicates the theory of the defense, which is that the scuffle over the gun arose out of the endeavor of George Cameron to wrest the gun from his brother in order to shoot Smith, and, having succeeded in getting possession of the gun, and being about to kill Smith with it, the latter shot George in self-defense. And so the conflict in the testimony turns in a large degree upon the point whether the scuffle over the gun between the two brothers had ceased when the defendant shot George.

Hogan, a state's witness, testifies that he came up after the scuffle about the gun was over, and he further testifies that his attention was attracted by loud talking in the back yard of the saloon, a locality fenced in by a light board fence, four and one half feet high; that, arriving there, he saw George and Jim Cameron and Smith, who were the only parties present. At that juncture, Jim Cameron was standing still with his hand holding the shotgun at "order arms," that is, with the butt resting on the ground; George was standing still also, about four feet from Smith, with his right hand up and his left hand down. Hogan saw no weapon in his hand, and, as Hogan came within hearing, George said, "Smith, you know you done me wrong," whereupon Smith just pulled his pistol down and shot him, saying, "take that," and then ran.

Jackson, another state's witness, testifies that the scuffle between the brothers over the gun after Jim

brought it out of the saloon was entirely *in play;* "they scuffled a good while and I stepped and got the gun; I was afraid it might be loaded and shoot both of them, and I took it and set it up by the side of the house; Jim picked it up and walked into the saloon, and took the gun in with him and after he had gone into the saloon, Smith said, 'Does he want the gun to shoot me with; if he does, let him have it;' that, upon this remark being made, George and Smith commenced to quarrel again and quarreled about fifteen minutes; George had no weapon in his hand and was just standing there; they began to talk to one another pretty rough; don't know exactly what they said, then Smith stepped back from George, pulled out his pistol and shot him, saying something as he did so; then he held the pistol up, backed out of the gate and ran. At the time when Smith shot George, Jim was in the saloon. When the scuffle for the gun was going on, George said nothing about shooting Smith;" that witness did not pick up soda bottle and threaten Smith with it, nor did witness offer to make up with Smith, nor were the brothers scuffling at or about the time the shooting took place; that took place a little while afterwards when Jim was in the house.

Lofton, another state's witness, testifies that he witnessed the brothers wrestling over the gun, then he went into the saloon and in about five minutes he heard the report of a pistol and looking out saw Smith with it; that he did not see Jim when the shot was fired; that he saw George, but saw nothing in his hand, nor did he think he had anything; did not see Jim after the shooting.

Jim Cameron, state's witness, also testifies that he and his brother were merely playing with the gun; that it was not loaded when they were scuffling, nor a shell in it that day; that after the scuffle was over he took

the gun into the boarding house which adjoined the saloon, or into the saloon, does not remember which; that about forty-five minutes, or may be not so long thereafter, the shooting occurred when witness was in the saloon, and then he got the gun from the boarding house and pursued Smith.

The testimony of John Knauer, witness for the defense, shows that the scuffle and wrestling over the gun was mere play; that the Cameron boys were scuffling over the gun and rolling around in the yard; everybody out there was laughing, and it was this laughter that attracted Knauer's attention and brought him out of the saloon; that Smith, at the time the scuffling was going on, was some fifty or seventy-five feet away in front of the barn, taking no part in the scuffle; that witness took his son Ed in the saloon and a young man named Best and locked the door; that five or ten minutes after that the shooting occurred; that Jim Cameron was not in the saloon at that time, and that the scuffle took place half an hour before the shooting. This witness also speaks of the quarrel about twelve o'clock; he orderd the parties out of the saloon; that Jim Cameron had a gun in the saloon that morning, and he and another of the party went hunting, and, after an absence of some two hours, all of the party returned to the saloon where the quarrel was renewed between George Cameron and Smith, they calling one another "d——d niggers," when witness again made them leave the saloon, and some time after that the scuffling began over the gun, and then, five or ten minutes after witness went into the house, the shooting occurred.

Ed Knauer, another witness for the defense, corroborates his father as to the scuffle over the gun being in sport and that everybody out there was laughing, Smith as well as the rest; that Jackson brought out a bottle and threatened to break Smith's head with it;

and Smith said he had better go away; but afterwards Jackson threw it down and then the playful scuffle over the gun began, and then Smith got to laughing with the rest; Smith at that time was standing still some twenty feet distant; that the brothers were scuffing over the gun when he went into the saloon, and, when he did so, he left standing out in the backyard the two brothers, Jackson and Smith, and that in about twenty minutes after witness went into the saloon the shooting occurred, and this was half an hour after the bottle incident.

Bert Long another witness for the defense testifies that he was present at the time when the parties, Smith, Jackson and the two brothers, were in the back yard, that the parties were all talking and laughing when George without a word of provocation suddenly said, "give me the gun and I will shoot him," meaning Smith; don't know whether George got the gun or not; "he made a dive for it." After they scuffled for a while over the gun they put a shell into it, and, when witness saw that, he says he went into the saloon and about three minutes after that he heard the shot fired.

This is the only witness who testifies to a shell being put into the gun, and he says that when George said "give me the gun," etc., Smith said "if he gets the gun I will shoot him." The evidence also discloses that the defendant made his escape and was afterwards arrested at Boonville, whither he had fled.

This in substance is the evidence in the cause and presents with sufficient fullness its salient features. Some minor points which arose in the progress of the trial and after its close will be noticed hereafter.

The defendant did not preserve in the motion for a new trial exceptions as to any instructions given at the instance of the state except the first; nor any exception to those given by the court of its own motion.

The instructions given at the instance of the state and on behalf of the defendant by the court of its own motion were as follows:

"1. The indictment in this cause was filed January 8, 1892, and charges the defendant with murder in the first degree.  Murder in the first degree is the killing of a human being, wilfully, deliberately, premeditatedly, and with malice aforethought.  As used in defining murder, and for the purpose of this trial, wilful means intentional as contradistinguished from accidental; deliberately means in a cool state of the blood, that is, not in a sudden passion caused by some just or lawful cause of provocation to passion; and the court instructs you that in this case there is no evidence tending to show the existence of any such passion or provocation.  Premeditatedly means thought of beforehand for any length of time, however short; malice does not mean spite or ill will, but signifies an unlawful state of the mind—such a state of mind as one is in when intentionally doing an unlawful act; malice aforethought means malice with premeditation that is, that the unlawful act intentionally done was determined upon before it was executed.

"2. Bearing the foregoing in view and considering it as a basis, the court submits to you the further instructions following, to-wit:  If you shall believe and find from the evidence that at the county of Jackson, state of Missouri, at any time prior to the filing of the indictment in this cause, the defendant, Thomas Smith, in the manner and by the means specified in the indictment, intending to kill George Cameron, did shoot and wound the deceased George Cameron, and shall further believe that such shooting and wounding was done wilfully, deliberately, premeditatedly and with malice aforethought, and shall further believe that within a year and a day thereafter,

and before the filing of this indictment, the deceased, George Cameron, at the county of Jackson aforesaid, died in consequence of such shooting and wounding done by the defendant, you will find the defendant guilty of murder in the first degree. If you find the defendant guilty, your verdict may be in the following form: 'We, the jury, find the defendant guilty of murder in the first degree.' If you find the defendant not guilty, you will simply so state in your verdict.

"3. Before you can convict the defendant, you must be satisfied of his guilt beyond a reasonable doubt. By a reasonable doubt is meant a doubt which has a reason for iis basis, and arising out of the evidence in the case considered as a whole, and not a mere possibility of the defendant's innocence.

"4. Flight of the defendant is a circumstance to be taken into consideration, in connection with all the other facts and circumstances in evidence, and if the jury find and believe from the evidence that the defendant, after the commiss on of the homicide alleged in the indictment, fled from his usual place of abode for the purpose of avoiding arrest and trial for said offense, they may take this fact into consideration in determining his guilt or innocence.

"5. Before you can acquit the defendant on the ground of self-defense, you must find and believe from the evidence that the defendant had reasonable cause to apprehend, and did apprehend, that George Cameron, the deceased, was about to inflict upon him some great bodily harm or take his life, and defendant believed that such danger was imminent and impending; and unless you so believe, you cannot acquit the defendant on the ground of self-defense."

"7. The defendant is a competent witness in his own behalf, and you must consider his testimony in

arriving at your verdict, but, in determining what credit you will give to him as a witness, you may consider the fact that he is the defendant testifying in his own behalf.

"You are the sole judges as to the weight of testimony and the credibility of witnesses.  In determining as to the credit you will attach to a witness's testimony, you should take into account the conduct and appearance of the witness upon the stand, the probability of the witness's narration, the opportunity the witness had to observe and to be informed as to the matters respecting which such witness gives testimony, the motives actuating the witness and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness; all these matters being taken into account with all the other facts and circumstances proven, it is your province to give to each witness such credit and to the testimony of each witness such weight as you deem proper; and if, upon consideration of all the evidence before you, you conclude that any witness has wilfully sworn falsely as to any material matter involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony."

The following instructions were given in behalf of the defendant:

"8. The court instructs the jury that if they find from the evidence that at the time the defendant shot George Cameron, he had good reasons to believe and did believe that the said George Cameron was about to inflict great bodily harm upon the defendant, and that defendant had good reasons to believe and did believe that the force used was necessary to protect himself from the impending danger, and shall further believe that the defendant shot Cameron to protect himself

VOL. 114—27

from such injury at the hands of said Cameron, then the jury will find the defendant not guilty.

"9. The court instructs the jury that the burden of proof to establish the guilt of the defendant devolves on the state; and the law clothes him with a presumption of innocence which attends him and protects him until it is overcome by testimony which proves his guilt beyond a reasonable doubt."

The court upon its own motion gave the following instructions:

"1. Although you may believe the defendant shot and killed the deceased, yet if you should further believe and find that at the time of such shooting and killing the defendant had, in consequence of the acts, attitudes and surroundings of the parties, reasonable cause to apprehend and did apprehend that he (the deceased) was about to do him (the defendant) some great bodily harm or to take his life, and that the defendant did such shooting and killing to save himself from the infliction of such injury or from the taking of his life, you will find the defendant not guilty, because the killing done under such circumstances and for such purpose is justifiable in law, because it was a killing done in self-defense. You will be careful and observe that the danger the defendant apprehended need not be a real or an actual danger, nor need it be a danger in fact impending or about to fall on him. It is sufficient to warrant an acquittal on the grounds of self-defense if you shall believe that the defendant actually apprehended such danger, that such apprehension was a reasonable one on his part, and that he in good faith under such apprehensions shot and killed to protect himself; and in this connection the court further instructs you that the defendant cannot be deprived of his right of acquittal on the ground of self-defense because it may be shown that he was in

fact exposed to no danger whatever at the hands of the deceased.

"2. In determining as to the apprehensions of the defendant at the time of the shooting, and the reasonableness of such apprehension, you should take into account all transactions between the defendant and the deceased on the day of the killing, together with all the facts or statements of others connected with such transactions; and you should give such transactions, acts and statements in connection with all the other evidence before you for the purposes herein mentioned, such weight as you deem proper."

*John M. Wood*, Attorney General, for the State.

(1) No reason was assigned for defendant's objection to Tim Jackson's evidence as to who was having the fuss, and it cannot be considered by this court. *State v. Brannum*, 95 Mo. 19; *State v. Gilmore*, 95 Mo. 554. (2) The action of the court in excluding the answer to defendant's question asked Jim Cameron, whether the shot was before the scuffling, worked no prejudice to defendant, as the question had already been answered several times by the witness. (3) James Clark was asked what Jim Cameron said had become of the missing cartridges when he returned the gun. The state's objection to this question was sustained and the defendant excepted. What Jim Cameron said was mere hearsay, and no ground had been laid for the testimony for the purpose of impeachment. The objection was properly sustained. (4) The conversation the defendant had with another was irrelevant, and his testimony as to what was said and done was hearsay and properly excluded. (5) The first instruction given on the part of the state is the only one that was excepted to by the defendant. That instruction

properly defines the technical terms used in describing the offense of murder in the first degree.   Where there is no evidence of a legal or just provocation, the jury should be instructed to that effect.   *State v. Sneed*, 91 Mo. 559; *State v. Ellis*, 74 Mo. 220; *State v. Landgraff*, 95 Mo. 97.   (6) There was no evidence warranting an instruction for murder in the second degree or manslaughter in any of its degrees.   (7) The defendant made no objection at the time to the panel of the jurors, and it is too late to do so in his motion for a new trial; not having made any objection at the time, or before the challenges were made and the jury selected and sworn to try the cause, he will be held to have waived any objection to the panel.   *State v. Waters*, 62 Mo. 197; *State v. Klinger*, 46 Mo. 224.   (8) There is no evidence sustaining the thirteenth and fourteenth allegations in the motion for a new trial; the motion does not prove itself.   *State v. McDaniel*, 94 Mo. 301.   (9) The court will see, from an examination of the affidavits filed, there is nothing in the fifteenth assignment in the motion for a new trial.   As soon as the trial had commenced the shackles were removed from defendant's hands.   (10) The defendant was not entitled to a new trial on the ground of newly discovered evidence. *State v. Fritterer*, 65 Mo. 422; *State v. Ray*, 53 Mo. 345; *State v. Laughlin*, 27 Mo. 111; *State v. Butler*, 67 Mo. 59; *State v. Burnham*, 77 Mo. 52; *State v. Smith*, 80 Mo. 516.

SHERWOOD, J.—I. The instructions given at the instance of the state for the defendant and by the court of its own motion presented the issues involved very fairly to the jury, and left nothing to be desired; so that it is unnecessary to quote the instructions refused the defendant.   These instructions covered the two prominent issues the facts in the evidence presented, to-wit,

*first,* was the homicide murder in the first degree, or *second,* was it justifiable as being in self-defense.   The testimony on the part of the state shows a clear case of the deliberate and premeditated shooting of the defendant, an unarmed man, who was not only defenseless, but standing still and making no attack on the defendant; while the testimony of the defendant shows a clear case of self-defense.   These being the only issues raised by the facts in evidence, the trial court properly refused to instruct on a lower grade of homicide than murder in the first degree.   *State v. Sneed,* 91 Mo. 559.

If the testimony of the defendant had shown that he shot by reason of hot blood, perhaps a different question might be presented, one not necessary to be now considered.   Moreover, the testimony of Bert Long conspicuously shows that the shooting was not done in the heat of passion, but with deliberation; for he says that: When George said "give me the gun," etc., Smith said, "if he gets the gun I will shoot him."

The elements of murder in the first degree were properly defined in the instructions given in accordance with well established precedents in this court, and the instructions on the other issue were equally as fair and favorable to the defendant and equally comformable to well settled precedents.   These instructions recognize the fundamental doctrine, one of universal recognition, that *"self defense is an affirmative, positive, intentional act."*   *State v. Gilmore,* 95 Mo. 564; *State .v. Tabor,* 95 Mo. 593, *et seq.*

It is true that this court in *State v. Stephens,* 96 Mo. 637, commonly known as the *"target gun"* case, announced a very different doctrine, to-wit:   That if the defendant's gun, without any design on his part, went off *accidentally* and killed the deceased, and the defendant was under no apprehension of danger, still this should not deprive him of an instruction on the ground

of self-defense; and because the trial court in that case instructed the jury that there was "no evidence that will warrant an acquittal on the ground of self defense," and refused to admit *evidence* of *previous threats*, the judgment was reversed. And doubtless it was that case which emboldened the defendant here to ask one of the refused instructions to the effect, that if the defendant "fired the shot at *random*," "that then the said jury shall find that the said shot was fired in self-defense." But *Stephens' case* is not law; it stands alone, and is at war with first principles and fundamental ideas and with everything hitherto written on the subject, so that we are constrained to overrule it; to approve it would be to recognize the anomalous doctrine of *accidental self-defense*.

II. It is insisted in the motion for a new trial that perjury was committed by Jim Cameron in regard to the whereabouts of the gun and of his own whereabouts when the shooting occurred. But he is supported in his testimony as to the gun being absent by Jackson, and he is supported in his statement as to the scuffle for the gun being over for some time before the shooting took place, both by the testimony of Jackson, John Knauer and Frank Hogan, and the only direct testimony to the contrary is that of the defendant himself. The main point in controversy, as before stated, was whether the playful scuffle for the gun was over before the defendant fired the fatal shot, and all the direct testimony on the subject is to the effect that it was, except that of the defendant.

Besides, the eighth instruction given at the instance of the state fully apprised the jury of their duty in case they should believe from the evidence that any witness had sworn falsely, etc. It belonged exclusively to the triers of the facts to determine this for themselves, and where, as here, the verdict of the jury

on the point in hand is abundantly sustained by the testimony of at least three witnesses, to-wit, Jackson, Hogan and Knauer, we are not disposed to interfere with the conclusions reached by the jury, especially so as that conclusion received the sanction of the trial judge when overruling the motion for a new trial. And even if the testimony of Jim Cameron were altogether rejected it would not change the result; and the same may be said of Jackson's testimony.

III. Regarding the eleventh and twelfth grounds of the motion for a new trial, it suffices to say that no objection was made or exceptions saved as to the method of summoning and impaneling the jury, and it is too late to do this for the first time in the motion for a new trial. *State v. Waters*, 62 Mo. 197; *State v. Klinger*, 46 Mo. 224; *State v. Gilmore*, 95 Mo. 554.

IV. The fourteenth and fifteenth grounds for a new trial, to-wit, that the court threatened to exclude the testimony of defendant from the jury when a certain question was asked him, and the oral instruction given by the court to the jury as to the manner the jury might conduct themselves, etc., even if erroneous, cannot be noticed, because no exception was saved thereto, nor is there anything of the sort preserved in the bill of exceptions, and the statement of such grounds in the motion does not prove itself. The same line of remark applies to the eighteenth, nineteenth, twentieth and twenty-first assignments for a new trial. *State v. Musick*, 101 Mo. 260; *State v. McDaniel*, 94 Mo. 301.

V. The fifteenth ground for a new trial recites that the defendant was allowed to remain in shackles after the trial had begun; but this statement cannot be supported by *ex parte* affidavits. The only way in which matters *occurring in the presence of the court* can be preserved is by incorporating them in the bill of excep-

tions. *State v. Hayes*, 81 Mo. 574; *State v. Musick*, *supra*.

VI. The second ground of the motion for a new trial recites that the court erred in rejecting competent evidence offered by the defendant. Among the exceptions saved on this score was one where the defendant offered to prove by his own testimony that in his flight from the saloon he met some one and offered to surrender himself; but on objection by the state this question was excluded. In this exclusion there was no error. Even if the defendant had actually surrendered himself to an officer he could introduce no evidence of such self-serving acts. *State v. Musick*, *supra*.

Another exception saved under this head was in relation to what Jim Cameron had said to James Clark about the missing cartridge when he returned the gun he had borrowed. As no ground had been laid for the impeachment of Cameron in regard to this matter, what Cameron said about it was mere hearsay, and properly rejected.

Still another exception under this head is found in the refusal of the court over the objection of the state to allow Jim Cameron to answer on cross-examination this question: "Then the shot was fired before you got to scuffling?" Of this question and its refusal it is quite enough to say that the same question in substance was without objection afterwards asked and answered by the witness.

Yet another exception under this head was taken because the court on the re-direct examination of the defendant by his counsel refused him permission to answer the question: "When was the first time you entertained any idea that they intended to do you any serious harm?" Of this question, too, it may be said, that in substance it had been asked and answered before, and the whole matter of the difficulty fully laid

before the jury by the defendant in his testimony before them.

VII. The third assignment for a new trial is the admission of illegal and irrelevant evidence offered by the state. One of the points made under this head was that contained in the twenty-fourth assignment, to-wit, that the state was permitted "to prove that the defendant had trouble the same day of the alleged shooting with a certain witness named Walker, and drew a revolver on him." Of this it may be said that the witness testified to this matter of his own head and without any objection being made. What the defendant's counsel did object and except to was the question whether the defendant had a pistol with him when he returned from the hollow. But there was nothing improper in this question, and besides it was one of the conceded facts in the case, and no reason was stated for the objection. The same may be said of the question asked Jackson by the state as to who was having the fuss, where no reason for the objection was given. *State v. Brannum*, 95 Mo. 19; *State v. Gilmore*, 95 Mo. 554. But in any event the question was a proper one, and was necessary to develop the case before the jury.

VIII. The twenty-third assignment which the motion for a new trial contains is in regard to newly discovered evidence. Of this ground it is only necessary to say that as to the testimony of Mrs. Knauer, it relates to the whereabouts of the shotgun on the Sunday afternoon, and tends to contradict or to impeach Jim Cameron and has been sufficiently touched upon already. A similar remark applies to an absent witness upon whom reliance is placed to contradict or impeach Jim Cameron in regard to the alleged admissions made by the latter to such witness. Sufficient has been said under this assignment to show that it falls within the rule so often laid down by this court in

regard to newly discovered evidence.    *State v. Musick*, *supra*, 274, and cases cited.

After a patient investigation of the record in this cause, discovering no reversible error therein, it only remains to say that we affirm the judgment and direct the sentence pronounced to be executed.    Revised Statutes, 1889, sec. 4298; *State v. Pagels*, 92 Mo. *loc. cit.* 317.    All concur.