THE STATE OF MISSOURI, Respondent, *v.* THOMAS H. KEENE, Appellant.

1. *Practice, criminal — Threats by deceased, the day prior to homicide.* — In an indictment for murder, evidence of threats made by the deceased the day prior to the homicide, and continuing uninterruptedly down to the time of the death, declaring his intention to kill the accused, is competent as a part of the *res gestœ*, and should not be excluded from the jury.
2. *Homicide — Character of deceased as desperate, etc., may be shown, when.* — Where a homicide occurs under such circumstances that it is doubtful whether the act was committed maliciously or from a well-grounded apprehension of danger, testimony showing that deceased was turbulent, violent and desperate, is proper, in order to determine whether the accused had reasonable cause to apprehend great personal injury to himself.

*Appeal from Boone Circuit Court.*

*O. Guitar*, for appellant.

I. The court erred in excluding the evidence of the threats. (State v. Sloan, 47 Mo. 604.)

II. The court erred in excluding the evidence of the witness, A. G. Burton, to the fact that the deceased was in the habit of carrying deadly weapons, and the further fact that he was a quarrelsome, dangerous and desperate man. (Monroe v. The State, 5 Ga. 85; The State v. Hicks, 27 Mo. 588.)

*A. J. Baker*, for respondent.

WAGNER, Judge, delivered the opinion of the court.

The defendant was indicted for killing one Evans, and on the trial the jury found him guilty of murder in the second degree, and assessed his punishment at sixteen years in the penitentiary.

It seems that the defendant had been on terms of amity and good-will with Evans till the day before the killing took place. On that day they met at the house of a friend, together with other company, when the defendant treated Evans with friendship and civility. But Evans had ascertained that the defendant was engaged to be married to a niece of his wife, and was greatly enraged about it, and, instead of returning the kind treatment of the defendant, he violently assaulted him with a pistol and knife, and swore that he would kill him, and that nothing but his blood would satisfy him. Through the intercession of friends he was kept from carrying out his purpose or hurting the defendant; but the defendant, in order to save himself from violence and death, was obliged to hide in another room, and finally make his escape from a back door. After this occurrence Evans renewed his threats; declared that he would make no compromise in reference to the matter; that he would kill defendant on sight, if it was the last act of his life. These threats were communicated to defendant the same evening.

It further appears that on the morning after the occurrence above referred to, and some two hours prior to the killing, the

defendant, in company with another person, went out to hunt prairie chickens, and when they had reached a point near the railroad depot, and just after the defendant had discharged his gun at some chickens, Evans came out of the depot and halloed to the defendant, saying to him that he was " a d—d cowardly son of a b—h," and that if he would come up there he would " thrash h—ll out of him," and that he intended to kill him if he married his niece. The only answer defendant made to this abuse was to ask Evans what he wanted to kill him for ; at the same time he told his companion that that would break up their hunt, and they immediately started home. On his arrival at home defendant went to his stable to put up his horse, and while he was still at his stable Evans, in company with two other persons, rode up. Evans went into a store across the street from the stable. Defendant wanted to go into the store and warm, for it was cold weather, but he was warned not to do so, as he would be in danger of his life if he met Evans. Defendant then stayed in the stable and sent friends to have an interview with Evans, for the purpose of trying to arrange the difficulty. He was willing to agree to almost anything, accept the most humiliating terms, and only desired that his life might be saved. But Evans was obdurate ; he would abate nothing of his hatred and his desire for blood, and the life of defendant only would satisfy him. Evans then came out on the street, and was in fierce altercation with the persons around him, when the defendant fired the shot from which he afterwards died. The defendant immediately gave himself up, declared that he fired the shot, and that he did it to save his own life.

At the trial the court excluded all evidence of what occurred on the day previous to the killing, and the threats made by the deceased in reference to his intention to kill the defendant. In this, the court unquestionably erred. This whole transaction, and all, the matters connected with the difficulty, are so nearly allied that it is impossible to separate them. From the inception to the fatal, consummation less than twenty-four hours intervened. The threats continued down uninterruptedly, and were all nearly coeval with the killing, and they were all brought home to the knowledge of the party who did the slaying. They constituted the chain of

one continued hostile series of acts by the deceased down to the time that he was shot. That they had created a dread in the breast of the defendant, and that he was in danger of losing his life, there can be no doubt, and the evidence was admissible to show the reasonableness of his fears. (The State v. Sloan, 47 Mo. 604.)

The court also erred in refusing the evidence offered by the defendant to show that the deceased was a violent, dangerous and desperate man. The character of the deceased would afford no justification, or even palliation, if it should be found that the defendant was the aggressor. Where a person commits a homicide without a reasonable cause to apprehend immediate danger of violence to himself, he cannot interpose the defense that the person whom he slayed was a dangerous and vicious man. All people alike are under the protection of the law. " But the imminence of danger that will justify us in acting upon the instinct of our nature, in repelling a blow before it is received, often depends upon the character of the assailant. The menacing attitude of a person generally peaceable and law-abiding would often excite no just apprehension of danger, while similar conduct on the part of a fierce, vindictive and passionate man would naturally alarm our fears, and make us prompt in anticipating his purposes. When danger is threatened and impending, we are not compelled to stand with our arms folded until it is too late to strike, but the law permits us to act on reasonable fear; and therefore when the killing has been under circumstances that create a doubt as to whether the act was committed in malice or from a sense of real danger, the jury have the right to consider any testimony that will explain the motive that prompted the accused." (The State v. Hicks, 27 Mo. 588.)

When the homicide is committed under such circumstances that it is doubtful whether the act was committed maliciously, or from a well-grounded apprehension of danger, it is very proper that the jury should consider the fact that the deceased was turbulent, violent and desperate, in determining whether the accused had reasonable cause to apprehend great personal injury to himself. If such evidence is ever legitimate, the facts in this case show that it was one calling for its introduction.

It is further insisted that the court erred in refusing to grant a new trial on the ground of newly-discovered evidence. The point is, I think, well taken; but as the case will go back for other reasons, it is wholly unnecessary to examine the question, as the evidence is now attainable and can be used on a new trial.

For the errors hereinbefore alluded to, the judgment must be reversed and the cause remanded. The other judges concur.