## THE STATE v. FEELEY, Appellant.

### Division Two, March 6, 1906.

1. **THREATS: Res Gestae: Malice.** A few hours before the homicide, while on the way with another party to the place where the homicide occurred, defendant said to the other party that "he was a straight shot and a game man, and I would find it out before I got back." The evidence showed that defendant did not at that time know the deceased. *Held,* that, while such threat was not admissible as a part of the *res gestae*, because it had no immediate connection with the homicide, yet it was admissible to show general malice and a disposition on the part of defendant to do an act which was criminal.

2. **EXCEPTIONS: Affidavits.** Matters of exception which occur in the presence of the court cannot be shown by affidavits, unless the court refuses to sign the bill when presented to him on the ground that the matters therein stated, or some of them, are not true.

3. **DEFENDANT AS WITNESS: Cross-Examination: Immaterial Matters.** The cross-examination of a defendant upon immaterial matters not testified to by him on his examination in chief, will not justify a reversal of the judgment, when no evidence is offered by the State to contradict him. And in this case, defendant having testified on direct examination to seeing deceased and another party at a certain place, permitting the State to inquire, on cross-examination, about the presence of other parties at the same time and place, did not constitute reversible error, none of the other parties being introduced by the State for the purpose of contradicting defendant.

4. **REPUTATION OF DECEASED: When Drinking.** Where defendant testifies that he shot deceased because he thought deceased was going to kill him, and there is testimony that at the time of the killing deceased was drinking, evidence of the character of deceased for being quarrelsome and dangerous when drinking is properly admitted.

5. ———: ———: **General Reputation: Rebuttal.** When defendant has introduced evidence tending to show that deceased was quarrelsome and dangerous when drinking, it is not error to permit the State, in rebuttal, to introduce evidence tending to prove that the general reputation of deceased in the neighborhood in which he lived for peace and quiet and good citizenship, was good.

6. ———: **Not Known to Defendant.** It is not necessary that defendant have knowledge of the general reputation of deceased in order to entitle him to introduce evidence tending to show that deceased's general reputation was that of a quarrelsome and dangerous man. [Overruling, as to this point, State v. Kennade, 121 Mo. 405.]

7. **INSTRUCTION: Motive.** Where defendant testifies that he shot deceased because he was afraid deceased was going to kill him, no instruction on motive is necessary.

8. ———: **Voluntarily Entering into Difficulty: Self-Defense.** When defendant voluntarily enters into a difficulty for some unlawful purpose, there can be no self-defense in the case. And the evidence in this case is *held* sufficient to justify the court in instructing the jury that there was no self-defense in the case if defendant voluntarily entered into the difficulty for the purpose of wreaking his malice upon deceased, or of doing him some great bodily harm.

9. ———: **Comment on Evidence: Impeachment.** An instruction which told the jury that, if any witness had been impeached, they were not for that reason bound to disregard his testimony, but might disregard the whole or any part of his testimony as

they might believe he had testified truthfully or falsely, is not erroneous, as being a comment on the evidence, simply because it may apply to the testimony of only one witness.

10. **MURDER: Indictment for First Degree: Prosecution for Second.** Upon an indictment for murder in the first degree, the State, with the permission of the court, may elect to prosecute the defendant for murder in the second degree, and defendant cannot complain that the State elected to prosecute him for a less than the highest grade of homicide.

11. ———: **Instructions on Both Degrees: Evidence.** In a homicidal case it is only when there is no evidence to authorize an instruction upon the particular grade of the offense on which an instruction has been given that it will be held to be erroneous. And where, as in this case, there is sufficient evidence to authorize instructions on both degrees of murder, there is no error in instructing upon the lower grade, or in refusing to instruct the jury to acquit defendant of that offense.

12. **RECORD: Changing After Appeal Taken.** No record, after being lodged with the clerk of the appellate court, can be changed without the permission of the appellate court, duly entered of record at the time.

Appeal from Bates Circuit Court.—*Hon. Argus Cox,* Special Judge.

AFFIRMED.

*Scott & Bowker, Francisco & Clark* and *W. W. Graves* for appellant.

(1) Calhoun, who drove the defendant from Archie to Burdette, was permitted to testify, over the objection of defendant, as follows: "He said he was a straight shot and he was a game man and I would find it out before I got back." This was on the road between Archie and Burdette, and was introduced as a threat. In this the court erred. It did not refer to deceased or any class to which he belonged. It was not a part of the *res gestae*. Defendant did not even know deceased at the time. The evidence shows that defendant and deceased met for the first time and were introduced to each other at Burdette, after the alleged threat. State v.

Crabtree, 111 Mo. 136; Goodwin v. State (Texas), 43
S. W. 336; Whittaker v. Com., 17 S. W. 358; State v.
Strange, 42 S. W. 551. (2) Instruction 11 should not
have been given and in giving it the court committed er-
ror. (a) There is absolutely no evidence tending to
show that defendant voluntarily entered into the diffi-
culty. An instruction not authorized by the evidence
should not be given. Simpson and the defendant are
the only witnesses who testify as to how the difficulty
occurred. Marr v. Bunker, 92 Mo. App. 651; King v.
King, 155 Mo. 406; Gorham v. Railroad, 113 Mo. 408;
Brown v. Ins. Co., 65 Mich. 306; Koehler v. Buhl, 94
Mich. 496; Iler v. Baker, 82 Mich. 226; Wright v. Senn's
Estate, 85 Mich. 191. (b) Had there been evi-
dence authorizing it, yet the form and wording is erron-
eous. State v. Rapp, 142 Mo. 443. (3) The court er-
red in permitting counsel for the State to cross-examine
defendant about matters not brought out in the exami-
nation in chief. State v. Graves, 95 Mo. 510; State v.
Elmer, 115 Mo. 401; State v. Patterson, 88 Mo. 88;
State v. Chamberlain, 89 Mo. 129; R. S. 1899, sec. 2637.
(4) The court erred in permitting the State to show
the general reputation of deceased when not drinking.
Defendant had only undertaken to show his general rep-
utation while drinking and the evidence offered in re-
buttal as to his reputation while not drinking was
improper, not proper rebuttal, and evidence upon an
issue not raised by defendant. Keener v. State, 18 Ga.
221; Wigmore on Evidence, sec. 1616. Having only
proven reputation of deceased while drinking, in rebut-
tal the State could not go further. State v. Creson, 38
Mo. 372; Babcock v. Babcock, 46 Mo. 243; Glenn v. Ste-
wart, 167 Mo. 584. (5) There should have been an
instruction upon motive. State v. Melvin, 166 Mo. 565;
State v. Evans, 158 Mo. 589; State v. Foley, 144 Mo.
600; State v. Heinze, 66 Mo. App. 135. (6) The court
should have instructed the jury to acquit defendant of
murder in the second degree. The evidence of Simp-

son for the State, the only eye-witness, makes it murder in the first degree and defendant was not tried for that crime. All the evidence showed it to be murder in the first degree or nothing. State v. Tettaton, 159 Mo. 354; State v. Meadows, 156 Mo. 110; State v. Tomasitz, 144 Mo. 86; State v. Garrison, 147 Mo. 548; State v. Cochran, 147 Mo. 504; State v. Kindred, 148 Mo. 270. (7) Instruction 14 is a direct comment upon the evidence of witness Simpson. State v. Rutherford, 152 Mo. 124.

*Herbert S. Hadley,* Attorney-General, and *N. T.* *Gentry,* Assistant Attorney-General, for the State.

(1) No error was committed in permitting the State to prove by witness Calhoun that defendant said "that he came from Nevada that morning, came down on the train and was going to his father's. He (defendant) said he was a straight shot and was a game man, and I would find it out before I got back." State v. Brown, 188 Mo. 456; Benedict v. State, 14 Wis. 425; Wills on Circum. Ev., 45; State v. Hoyt, 47 Conn. 538; State v. Harlan, 130 Mo. 375; State v. Crawford, 39 Mo. 74; Hopkins v. Com., 50 Pa. St. 9; State v. Guy, 69 Mo. 430; Brooks v. Com., 37 S. W. 1043; 1 Greenl. on Evid., sec. 108; State v. Hamilton, 170 Mo., 383; Dixon v. State, 13 Fla. 695. (2) No error was committed in allowing the prosecuting attorney to cross-examine defendant as to who he saw when he came back from the school house yard to where the deceased was standing. How defendant could possibly be harmed by such cross-examination is difficult for any one to understand, and his counsel have failed to even suggest any prejudice resulting to him. State v. Kyle, 177 Mo. 663; State v. Avery, 113 Mo. 499. (3) The court committed no error in allowing the State to show the general reputation of deceased when not drinking; as character evidence was collateral to the issue and not a direct question for the

jury to pass upon. State v. Pettit, 119 Mo. 415. (4) Whether any motive was shown for the homicide or not, the defendant was clearly guilty under the evidence —yes, guilty under his own testimony in the case. He certainly was not entitled to acquittal because the State failed to show what was his motive in shooting the deceased and in shooting him after he had fallen to the ground. State v. Foley, 144 Mo. 600; State v. David, 131 Mo. 380. (5) Even though the defendant was guilty of murder in the first degree, he cannot complain of the instruction for murder in the second degree, nor of his conviction for that offense. State v. Frazier, 137 Mo. 340; State v. Bell, 136 Mo. 124; State v. Hopper, 71 Mo. 430; State v. Keeland, 90 Mo. 340; State v. Wagner, 78 Mo. 648; R. S. 1899, sec. 2369; State v. Silk, 145 Mo. 284. (6) Instruction 14, complained of by appellant, is not a comment on the testimony of the witness Simpson, but a declaration of the law on the weight to be given to the evidence of the various witnesses. (7) The evidence was sufficient to warrant a verdict of murder in the second degree; and ten years' imprisonment is a very light punishment, when the circumstances attending the killing are all considered.

BURGESS, P. J.—At the October term, 1903, of the circuit court of Bates county the grand jury of said county preferred an indictment against the defendant, Robert Feeley, charging him with murder in the first degree, in having, on the 8th day of September, 1903, at said county, shot and killed, with a pistol, one Martin Hoots. There were two mistrials. Thereafter, at the May term, 1905, of said court, the defendant was again put upon trial on the charge of murder in the second degree, convicted, and his punishment assessed at ten years' imprisonment in the penitentiary. He filed motions for new trial and in arrest of judgment, which

194 Sup—20

being overruled, he saved his exceptions, and appeals to this court.

The evidence tends to show that the defendant was born and raised in Bates county, near a small town called Burdette. The defendant, some twelve years before the trial of this cause, moved to Nevada, in this State, where he has resided ever since. On the 8th day of September, 1903, defendant left his home in Nevada for the purpose of visiting his father at his home near Burdette. He went by train to a little place called Archie, where he hired one Frank Calhoun to take him in a buggy to Burdette. While on the road to said town the defendant pulled a pistol out of his pocket and remarked to Calhoun that he was a straight shot and a game man, and that he, Calhoun, would find it out before he got back. When Burdette was reached they saw Martin Hoots, the deceased, with a gun on his shoulder, walking along in front of a store owned by a man named Buel Mudd. There was evidence tending to show that defendant said, ''There goes a dirty coward,'' and that deceased, who appeared to have heard the remark, replied, ''If he calls me a dirty coward I will take it up.'' Deceased went into the store to buy some shot-gun shells, but was told that there was none in stock. Deceased then set his gun down in the store, and a friend picked it up and carried it away to the residence of Dr. Cash. David Roach was sitting on the porch of the store when defendant got out of his buggy. As deceased came out of the store, and was passing by Mr. Roach, he greeted the latter with, ''Hello, Dave.'' Defendant, who was near by, said, ''Who in the hell are you?'' Deceased replied, ''I don't know as it's any of your business.'' Defendant then said, ''You are not so game but what I am just as game as you are;'' to which deceased replied, ''If you are looking for trouble you are up against it.'' Then defendant said, ''You run on home,'' and deceased rejoined, ''You had better make me run on home.'' Mr. Roach then walked away with de-

ceased about a distance of sixty feet and deceased asked
who that was, at the same time saying he thought it was
Bob Feeley, and that he loved every man named Feeley.
He also told Mr. Roach that he had had some trouble
with Jim Fenton, and had shot at the latter to scare him,
but that the next time he shot he would shoot to kill Fen-
ton. Professor Maxey, who was near by, saw defendant
on the porch of Roach's store take a pistol out of his
pocket, wave it around his head, and then walk off the
porch. Defendant followed after deceased, but Mr.
Roach took hold of him and led him back to the store,
when defendant said, "Who is that son of a bitch?"
Being told deceased's name, defendant said, "He is
looking for trouble; I will fix him if he bothers me."
Defendant then took his pistol out of his pocket and ex-
hibited it to Roach and others. He appeared to be in-
toxicated, and he and deceased, who was drinking, had
several disputes during the afternoon.

Deceased and one Jim Fenton, who lived near the
edge of the town, had had some trouble in the forenoon
of the day of the homicide, and deceased had been up to
Fenton's a time or two to see him. After he returned
from Fenton's house, the last time he was there, and
about half an hour before the shooting, one Wilkerson
introduced deceased to the defendant. The two men
shook hands, the deceased remarking, "Give me your
hand, Bob; I understand you are a brother of Crit and
Frank Feeley." Both men appeared to be friendly,
and a short time afterwards they were seen by several
persons standing near the hitch rack, drinking whisky.
Calhoun, seeing the defendant's condition, tried to get
him away, and did succeed in getting him into the buggy.
Just then the deceased passed by, on his way to the
store, and said to the men standing there, "The coward
would not come out." About this time some man came
out of the blacksmith shop and told defendant that de-
ceased was talking about him, and defendant at once got
out of the buggy and told Calhoun to go on home.

Cothrien, a witness, told the defendant to get back in the buggy, and assured him that deceased was talking about Jim Fenton, with whom he had had trouble. Defendant then said he was going to see Fenton, and started towards Fenton's residence, and while on the way he met Mrs. Fenton and had a talk with her, after which he was seen at the back of said blacksmith shop, where he again met deceased. A witness saw deceased take a drink out of defendant's bottle and then throw the bottle down. The two men stood talking for a few minutes, when defendant fired a shot, and deceased fell. Defendant then fired four more shots in rapid succession, which took effect upon deceased, and he also struck deceased on the back of the head with his pistol. He then threw his pistol and hat on the ground and walked towards an iron bridge, a short distance off. While on the bridge defendant waved his hands over his head several times, and then returned to where the dead body lay. In the meantime several persons appeared on the scene and saw that Hoots was dead, and that defendant's hat, a whiskey bottle and a thirty-eight calibre pistol were lying on the ground near by. One of the shots entered deceased's body about one and a half inches to the left of the median line and came out at about the same distance to the right of said line. Another bullet entered just under the left eye and came out above the right ear, passing through the brain. Three bullets entered in the back. Defendant asked the people who had gathered near the body who the deceased was, and when some one remarked that the man was dead, defendant said, "He is not dead to me." About this time a rain storm was brewing, and the persons present moved the dead body to the store, and gathered up some rocks and marked therewith the place where the body lay. There was evidence to show that there were no rocks nearer than twenty feet to the body at the time, but upon this question the evidence was conflicting. The deceased had no weapons on his person at the time of the shooting.

That night defendant was heard say, "I am the worst son-of-a-bitch in town; he has been running over me all day, and now I have shot it into the back of his neck; shot it in right." He used similar expressions in the hearing of others.

The evidence upon the part of the defendant tended to show that there were rocks at the place where the deceased fell when shot. Defendant also showed by a number of witnesses that his reputation for peace and good order at Nevada, where he lived, was good. He also testified in his own behalf substantially as follows:

Q. You may state your name to the jury? A. Robert Feeley.

Q. You are the defendant in this case, are you, Mr. Feeley? A. Yes, sir.

Q. How old are you, Mr. Feeley? A. Forty years old.

Q. Are you a married man. A. Yes, sir.

Q. Son of Uncle Norris Feeley of this county? A. Yes, sir.

Q. Where were you born? A. Out west of Burdette.

Q. West of Burdette. Mr. Feeley when did you leave Bates county and Cass county and go south? A. About eighteen years ago.

Q. How much of that time, where did you live? A. Nevada.

Q. How much of that time have you lived in Nevada? A. About twelve years.

Q. What is your business? A. Barber.

Q. On the 8th day of September, 1903, where did you start? A. Started to my father's.

Q. Your father's. State to the jury, Mr. Feeley, what time you got to Burdette about? A. Why, I guess about four or five o'clock about.

Q. Four or five o'clock? A. Yes, sir.

Q. Well, just state to the jury when you got to Burdette and what you did? A. I got out of the buggy

and stepped upon the porch and met Mr. Roach.   A. Met Mr. Roach there and was talking to him.

Q.   Where was it you got out?   A.   Mr. Mudd's store.

Q.   Mr. Buel Mudd's store?

Q.   Mr. Feeley, when and where was the first time you saw the deceased, Martin Hoots?   A.   I was standing on the store porch and he came up.

Q.   Had you ever met or heard of Martin Hoots prior to that time?   A.   No, sir.

Q.   What was he doing when you first saw him?   A. He was going south.

Q.   State to the jury what, if anything, he had? A.   He had a shot gun.

Q.   State to the jury what conversation, if any, you had with the deceased, or in his presence?   A.   Well, he came up and I asked Mr. Roach who he was.   He says, "He is Martin Hoots," and he said, "It's none of your business."

Q.   Who said that?   A.   Mr. Hoots did.

Q.   Mr. Hoots said, "It's none of your business?"

Q.   Mr. Feeley, what further conversation, if any, did you have there with Mr. Hoots?   A.   Why, Mr. Roach says, "that is Uncle Norris Feeley's son," and he said he had an order on Crit, my brother, for some money and I told him I guess Crit would pay it and he talked a few minutes and he walked on away.

Q.   When he left you where did he go?   A. He went south.

Q.   Which way?   A.   Towards the old blacksmith shop.

Q.   Where did you go when the deceased started toward the old blacksmith shop, where did you go?   A. I went out south of the store to get in and go home.

Q.   Who did you see, if any one, while you were at the buggy?   A.   Uncle Dan Cothrien.

Q.   When did you next see the deceased, Martin Hoots, Mr. Feeley?   A.   He came up to the buggy.

Q.  Coming which way?  A.  From the west.

Q.  What did he have with him, if anything?  A. He had a shot gun.

Q.  State to the jury what, if anything, Martin Hoots said when he addressed you?  A.  Well, he said, "The God damned  son-of-a-bitch was a coward, he wouldn't come out."

Q.  What did you do then?  A.  I stepped out of the buggy.

Q.  Was anything further said there at that time between you and Mr. Hoots?  A.  No, sir.

Q.  What became of Hoots?  A.  He went on north toward the store.

Q.  Where did you go?  A. ' I went over behind the store to the old school house.

Q.  Back of the old school house?  A.  Yes, sir.

Q.  How did you happen to go over there? A. Well, Mrs. Fenton was over there and she called me to come over.

Q. ' Did you have any conversation with Mrs. Fenton?  A.  Yes, sir.

Q.  What was it?  A.  Back of the school house.

Q.  Was it, or was it in the school house yard?  A. It was in the school house yard.

Q.  State what conversation, if any, you had with Mrs. Fenton in regard to the deceased, Martin Hoots? A.  Well, I was talking with her and going to go up home with her and she said for me not to go with her, that her son Jim had been having trouble with Hoots and for me not to go, that he was a dangerous man to go about, and I didn't go.

Q.  Where did you next see the deceased, Martin Hoots?  A.  In behind the blacksmith shop.

Q.  What, if anything, was said by you, or Hoots? A.  Why, he called for me to come over where he was.

Q.  Where were you when he called you? A.  I was in the school house yard.

Q. Where was Hoots? A. He was back of the blacksmith shop.

Q. Did you go to the back end of the blacksmith shop where Hoots was? A. Yes, sir.

Q. What was said by you or Hoots when you got over there, if anything? A. Well, he wanted to know what God damned old woman that was I was talking to. I told him it was old grandma Fenton. He says, "God damn it. I have been up to Fenton's two or three times after Jim," and he says, "The coward won't come out." He says, "I have had trouble with him." He says, "I made him and sheriff Mudd leave town," and this town belonged to him. And he asked me if I had any whiskey and I told him yes, and he wanted a drink and I pulled out my bottle and handed it to him and he says, "No, you take a drink." I took a drink and then he drank and threw it down. He says, "This whiskey is no account, bad stuff," and he says, "Just like you." He says, "I am going to make you go home." I told him if he would wait a few minutes I would go home without making. He says, "No, you ain't, I am going to make you go now." He stepped towards me and I stepped back and pulled my gun and told him to stand back, I didn't want any trouble. He reached back to pick up a rock and then I commenced shooting.

Q. Now, Mr. Feeley, just stand up here and show the jury the position Hoots was in when you commenced firing the pistol. Just come down here, I guess you had better. Which way first was Mr. Hoots standing from you when you had this conversation with him? A. He was standing about like that (indicating).

Q. Where was he with reference to where I would be. Say I am Hoots, which way was he, what direction? A. I was west of Hoots about where you are standing.

Q. Now just show the jury what position Hoots was in when you fired the first shot? A. Something like this (stooping down).

Q.  Where were you standing if you were Hoots?
A. About where I was.

· Q.  Now, Mr. Feeley, how many shots did you fire,
do you know?  A.  No, I emptied my gun.

Q.  Mr. Feeley, what was the position of Hoots
when you fired the last shot?  A.  Well, it was about
straight.

Q.  You may state to the jury why you shot Martin
Hoots?  A.  Well, sir, I did because I —

Mr. Jackson (interrupting): "I object to that."

Court: "Overruled."

A.  I done it because I was afraid he was going
to kill me.

Q.  Was going to kill you?  A.  Yes, sir.

Over the objection and exception of defendant, the
court gave fourteen instructions covering murder in
the second degree, self-defense and reasonable doubt,
only two of which, the eleventh and fourteenth instruc-
tions, are criticised.  The grounds of objection and crit-
icism will be reviewed later in this opinion.

It is contended by defendant that the court com-
mitted error in admitting in evidence, over the object-
ion of defendant, the testimony of witness Calhoun,
which was to the effect that while on the way from
Archie to Burdette, defendant said to him, "he was a
straight shot and he was a game man, and I would find
it out before I got back."  The contention is that, while
admitted as a threat, it is too vague and indefinite to be
called such, and that even if it could be so called, it
was inadmissible.  That defendant did not know the
deceased at the time is clearly shown by the evidence,
and the threat could not, therefore, have been made
against him in particular.  In State v. Crabtree, 111
Mo. 136, it was held that general threats made by the
defendant before the homicide, and having no reference
to the deceased, were not admissible in evidence against
him.  But in that case the evidence showed that the
threats applied to the members of defendant's own

family, if to any in particular, and had no reference whatever to the deceased. In Godwin v. State, 38 Tex. Cr. Rep. 466, that case was cited with approval. In the last case cited, which was a prosecution for murder, it was held that testimony of threats made by the defendant, on the day preceding the homicide, to kill somebody, but not directed in any way towards the deceased, was inadmissible. Practically the same rule is announced in the case of Strange v. State, 38 Tex. Cr. Rep. 280. Counsel for defendant also cite Whitaker v. Commonwealth (Ky.), 17 S. W. 358, as sustaining the contention of the defendant, but it does not do so. On the contrary, it was ruled that general threats, while not competent as part of the *res gestae*, part of the bloody transaction, were competent as showing general malice, and a purpose to injure or kill someone, and the deceased became the victim.

In the recent case of State v. Brown, 188 Mo. l. c. 465, Fox, J., in speaking for the court, held such threats to be admissible in evidence, "as indicating the existence of a frame of mind or disposition from which criminal actions proceed, and the action of the court in overruling the objections of defendant to the introduction of those statements is fully supported by the rule as announced upon this subject in State v. Grant, 79 Mo. l. c. 137; State v. Guy, 69 Mo. 430; State v. Hamilton, 170 Mo. 377."

In Hopkins v. Com., 50 Pa. St. l. c. 15, the rule is stated in the following language: "Nor was it necessary that the premeditated malice should have selected its victim. If the jury believe that the defendant had formed the deliberate design to kill somebody, and in pursuance of that purpose, within an hour after declaring it, did kill McMarity, the Commonwealth has a right to insist upon his conviction of murder in the first degree, and that they might thus insist, they had a right to prove his declaration an hour before the deed."

In Brooks v. Com., 100 Ky. 194, it is held that gen-

eral threats by the accused to kill someone, made shortly before the homicide, were admissible to show malice, without proving that such threats were directed toward any particular individual. The court said: "According to the weight of authority, the testimony of the other witnesses of general threats made by the accused or of his purpose to do an act which would be criminal, the like of which followed, was admissible in order to establish 'general malice and purpose to injure or kill some one,' of which the deceased became the victim."

We do not think the threat proven in the case at bar was admissible in evidence as part of the *res gestae*, because it had no immediate connection with the homicide, which occurred several hours afterwards, but we do think, according to the weight of authority and the rule announced in our own decisions, it was admissible to show general malice and a disposition on the part of the defendant to do an act which was criminal, such threat to be given such weight by the jury as they, under all the circumstances, thought it entitled to.

The point is made by defendant that the court erred in permitting W. O. Jackson, counsel for the State, in course of his argument to take a pistol, and have Mr. Ludwick, the prosecuting attorney, assume different attitudes in front of the pistol in order to demonstrate what could or could not have been the range of the shots. But no such occurrence is shown by the bill of exceptions, and cannot, therefore, be considered by this court. Matters of exception which occur in the presence of the court cannot be shown by affidavits, unless the court refuses to sign the bill when presented to him upon the ground that the matters therein stated, or some of them, are not true. [State v. McAfee, 148 Mo. 370; State v. Grant, 144 Mo. 1. c. 66; State v. Lamb, 141 Mo. 298; State v. Reed, 154 Mo. 1. c. 126.]

Defendant testified in his direct examination to going to the school house yard and talking to Mrs. Fenton, and to returning to a point behind the blacksmith shop,

and there seeing and talking with deceased; and, over the objection of defendant, the prosecuting attorney, in the cross-examination of defendant, was permitted to ask him about the presence  of Rich Haley, Toney Rhodes, Willie Nelson and Sol Wilkerson there at the same place and time, although he had not testified to the presence of either of them in his examination in chief. Defendant contends that this was error.   Section 2637, Revised Statutes 1899, by implication, prohibits the cross-examination of a defendant in a  criminal  case, who testifies in his own behalf, touching matters not testified to by him in his examination in chief, if timely objection be interposed to such cross-examination; and it has been held that the defendant can only be cross-examined as to matters referred to by him in his examination in chief.   [State v. Chamberlain, 89 Mo. 129; State v. Patterson, 88 Mo. 88, and authorities cited.] But we do not think that such a cross-examination, regardless of the fact that it may not be prejudicial to the defendant or work him any harm, should, *ipso facto,* be ground for the reversal of a judgment of conviction; otherwise the most immaterial matter elicited from a defendant on cross-examination, and not testified to in chief, would authorize the reversal of a judgment of conviction.   We cannot believe that such was the intention of the Legislature in passing the law.   Whether the persons named, or either of them, were present at the time and place indicated was entirely immaterial for the purpose of this inquiry, and we are unable to see in what way the mere fact that defendant was improperly cross-examined as to their presence could prejudice his case.   Moreover none of these persons was introduced as a witness by the State for the purpose of contradicting the defendant with regard to the fact of his or their presence at the time and place indicated.   In an exhaustive review of the authorities upon this question, at the present term of the court, in the case of State v. Barrington, not yet reported, Fox, J., in speak-

ing for the court, held that the cross-examination of a
defendant upon immaterial matters not testified to by
him upon his examination in chief, will not, when no
evidence is offered by the State to contradict him, jus-
tify a reversal of a judgment of conviction.

It is said for defendant that the court erred in per-
mitting the State to show the general reputation of de-
ceased when *not* drinking, when the defendant had only
introduced evidence tending to show that deceased was
a quarrelsome and dangerous man *when* drinking. The
argument is that such evidence upon the part of the
State was improper, not rebuttal, and brought forward
an issue not raised by the defendant. The record shows
that, in rebuttal to testimony offered by defendant tend-
ing to show that deceased was a quarrelsome and dan-
gerous man when drinking, the State introduced evi-
dence tending to prove that the general reputation of
deceased in the neighborhood in which he lived, for
peace and quiet and good citizenship, was good.

In support of the contention of defendant, Keener
v. State, 18 Ga. 194, is chiefly relied upon. In that case
the deceased, who was a railroad conductor, was killed
by Keener in a brothel. Upon his trial for murder the
defendant proposed to prove the general character of
deceased for violence in the particular place where the
difficulty occurred, to which the State objected and the
evidence was excluded. The case went to the Supreme
Court of that State, and the judgment of conviction was
reversed upon the ground of the exclusion of said evi-
dence, the court expressly repudiating the general doc-
trine that a person can have but one general reputation,
and that in the neighborhood only in which he lives, and
holding that "a man may have different general charac-
ters, adapted to different circumstances and localities;
that is, a character for rail-cars and a character for the
brothel; a character for the church and one for the
street; a character when drunk and a character when
sober." Wigmore on Evidence, vol. 2, sec. 1616, is an-

other authority rélied upon by defendant as sustaining his contention. The doctrine announced in the Keener case forms the basis of the text in that work upon this subject. These authorities, with perhaps one exception, namely, Railroad v. Reynolds, 117 Ga. 47, are the only ones to which our attention has been directed, or that we have been able to find after diligent search, which announce this doctrine. But even these do not sustain defendant's contention, because it is not pretended in this case that deceased had acquired any kind of reputation at any place other than in the neighborhood in which he resided, while the question decided in Keener's case, upon which the other authority cited by defendant is based, was that a man may acquire and have, at the same time, different general reputations in different places or localities. While it would have been proper for the defendant to show by testimony the general reputation of deceased in the neighborhood in which he lived for violence and quarrelsomeness when drunk, yet, under the circumstances hereinafter to be noted, that was only one trait or quality of his disposition which went to make up his general reputation, and not separable from it, and the State should not, therefore, be deprived of the right to show, in rebuttal, his general reputation for peace, quiet and good citizenship, in the neighborhood in which he resided.

In the case of Hussey v. State, 87 Ala. 121, it was said: "There was no error in allowing the State to prove the good character of the deceased for peace and quiet. The ground of objection to this evidence seems to be that the general reputation of the deceased had not been put in issue, but only the particular traits of his character as a quick-tempered, violent man, easily provoked, and likely to provoke a difficulty. If these traits of disposition are provable at all—which we do not decide—they are not separable from the question of character. It is plain that the State could rebut this evidence by proof of defendant's [sic] reputation for

peace and quiet, the whole question of character often going to the intent with which an alleged crime was committed, 'the prevailing character of the party's mind, as evinced by the previous habits of his life, being a material element in discovering that intent in the instance in question.' [1 Greenl. Ev., sec. 54, n. 3.]."

Whether or not, in a trial for murder, where it is doubtful whether the homicide was committed with malice or from a well-grounded apprehension of danger, the defendant has the right to show the quarrelsome and dangerous reputation of the deceased, as tending to show that the killing was not in malice, regardless of the fact that he may not know it at the time of the killing, as well also as to whether the defendant has the right to show such reputation under any circumstances, the authorities are much in conflict. In State v. Hicks, 27 Mo. 588, the rule that defendant must at the time of the killing have knowledge of the reputation of deceased for being a quarrelsome and dangerous man, was expressly recognized by an instruction asked by defendant himself, which was refused by the trial court, and which this court ruled should have been given. While that case was followed in some respects in State v. Keene, 50 Mo. 357, the rule was not followed respecting the necessity of knowledge on the part of defendant of the general reputation of the deceased in order to entitle him to introduce evidence tending to show that deceased's general reputation was that of a quarrelsome and dangerous man. The court said: "When the homicide is committed under such circumstances that it is doubtful whether the act was committed maliciously, or from a well-grounded apprehension of danger, it is very proper that the jury should consider the fact that the deceased was turbulent, violent and desperate, in determining whether the accused had reasonable cause to apprehend great personal injury to himself." The same rule is announced in State v. Bryant, 55 Mo. 75. The same question was before this court again in State v.

Downs, 91 Mo. 19, in which it is said: "When the kill-ing has been done under such circumstances that there is doubt as to whether the act was done from malice or from a sense of real danger, testimony of the turbulent character of the deceased may be received, and should be admitted, as tending to show and explain the motive that prompted the act," citing State v. Hicks, supra; State v. Elkins, 63 Mo. 159; State v. Keene, 50 Mo. 360; State v. Bryant, 55 Mo. 77. In the more recent case, however, of State v. Kennade, 121 Mo. 405, it was held that evidence as to the reputation of deceased for quar-relsomeness was properly rejected, it not having been shown that defendant knew it. The court said: "Even if deceased had a reputation for being quarrelsome and dangerous, evidence of it could not have been received unless it had been previously shown that defendant knew it, and therefore might more reasonably appre-hend danger in certain circumstances than if that repu-tation had been different. As this knowledge of defend-ant of the reputation of deceased is affirmatively shown by his testimony not to have existed, an answer to the question asked the officers was correctly denied," cit-ing State v. Hicks, 27 Mo. 590. That case is clearly in conflict on this point with the previous decisions of this court which we have cited, and should not longer be fol-lowed.

In the case at bar, defendant testified that he shot deceased because he was afraid deceased was going to kill him, and under such circumstances evidence of the character of the deceased for being quarrelsome and dangerous when *drinking* was properly admitted.

A point is made upon the failure of the court to instruct the jury upon the question of motive when re-quested by defendant to instruct upon all the law of the case. No instruction upon this particular feature of the case was necessary for, according to the defendant's own testimony, he shot deceased because he was afraid he was going to kill him. In other words, his motive in

shooting deceased, if his testimony be true, was to defend himself against the apprehended assault which was then about to be made upon him by deceased; and in the instruction on the right of self-defense given in the case defendant was given the full benefit of such motive. Moreover, there was no error for failure to instruct upon motive, "because a man is not to be acquitted of crime simply because his motive for perpetrating it cannot be discovered." [State v. Brown, 168 Mo. 449; State v. David, 131 Mo. 397.]

Instruction number eleven is claimed to be erroneous upon the ground of absence of evidence tending to show that defendant voluntarily entered into the difficulty. This contention is groundless. The evidence tended strongly to show that defendant was rather anxious to get into a difficulty with someone, particularly the deceased; certainly he did not try to avoid it. His frequent aggravating remarks in the presence of and directed toward the deceased for the evident purpose of provoking him into a difficulty, his shooting him while unarmed and even after he was down, and all the circumstances connected with the killing, show that defendant not only voluntarily entered into the difficulty for the purpose of wreaking his malice upon deceased, but that he sought and provoked it, for such purpose. But, says defendant, even if there was evidence authorizing the instruction, the form and wording in which it is couched is erroneous. In support of this position defendant relies upon State v. Rapp, 142 Mo. 443. Instructions numbers one and two, commented on in that case, deprived the defendants therein of the right of self-defense if they voluntarily entered into the difficulty, whatever their motive, even though it might have been for the sole and only purpose of defending themselves against the assault of their adversary, while under the law it is only where the difficulty is entered into for some unlawful purpose, such as taking the life of the

adversary or to do him some great bodily harm, as provided in the instructions in this case, that the defendant is deprived of the right of self-defense. "Self-defense is an affirmative, positive intentional act," and it logically follows that such act is voluntary. [State v. Gilmore, 95 Mo. 554.] In speaking for the court in the case of State v. Gordon, 191 Mo. l. c. 126, GANTT, J., said: "It has been ruled in various cases by this court that self-defense is an affirmative, intentional act, and in that sense is voluntary, and while, perhaps, it was too strongly put in State v. Rapp, 142 Mo. l. c. 448, to say that 'voluntarily entering into a difficulty is not an ingredient of any homicidal crime,' as was said in that case, still we think that it is clear that when one is assaulted by another and he neither brought on or voluntarily entered into such a difficulty with a view to take advantage of a quarrel begun between him and his opponent, he does not forfeit his right of self-defense by voluntarily resisting the assault made upon him, and if the circumstances are such that when thus assaulted he has reasonable cause to believe and does believe that his opponent then and there entertains a design to kill him or do him some great bodily harm, and there is imminent danger of the accomplishment of such design, then he may resist the accomplishment of such a purpose by killing his adversary to prevent the accomplishment of such a purpose." But, as we have said, when the difficulty is entering into for some unlawful purpose, such as wreaking or gratifying malice, then there can be no self-defense in the case. The position taken by the defendant with reference to this instruction is, we think, clearly untenable.

In the brief of counsel for defendant it is insisted that instruction fourteen is erroneous in that it is a direct comment upon the evidence of W. T. Simpson, who was a witness for the State. The position is that no other witness was impeached in the way indicated by the instruction, and that the effect of it was to bolster

up his testimony. The case of State v. Rutherford, 152 Mo. 124, is relied on by defendant to sustain his contention; but the reason the instruction in that case was condemned was because it singled out certain evidence which was before the jury and gave it marked prominence, when the weight of all the evidence was for the consideration of the jury. The instruction in this case in no way intimated to the jury the weight to be given to the testimony of any particular witness, but told them, as it should, that if any witness had been impeached, they were not for that reason bound to disregard his testimony, but were at liberty to disregard the whole or any part of the testimony of such witness, or believe or disbelieve him, as they might believe that he had testified truthfully or falsely in the case. That the instruction may not have applied to any other witness than Simpson makes it no more objectionable than an instruction which tells the jury that if they believe that any witness has wilfully sworn falsely to any material fact, they might disregard all or any part of the testimony of such witness as might seem to them proper, which has so often been approved by this court that it seems unnecessary to cite the decisions upon the subject.

A further contention is that the court should have instructed the jury to acquit the defendant of murder in the second degree. The argument is that the evidence of Simpson, a witness for the State, and the only person who saw the killing, makes it murder in the first degree, and that defendant was not tried for that crime; that all the evidence showed it to be murder in the first degree or nothing. When a person is indicted for murder in the first degree, as in this case, the State, with the permission of the court, may elect to prosecute him for murder in the second degree, and the defendant will have no right to complain of the course of the State in electing to prosecute him for a less than the highest grade of homicide. [R. S. 1899, sec. 2369; State v. Tal-

mage, 107 Mo. 543; State v. Lowe, 93 Mo. 547; State v. Keeland, 90 Mo. 337; State v. Nelson, 88 Mo. 126; State v. Wagner, 78 Mo. 644; State v. Burk, 89 Mo. 635; State v. Moxley, 115 Mo. 644.] While the case of State v. Talmage, supra, has been expressly overruled as to what it takes to constitute manslaughter in the third degree (State v. Pettit, 119 Mo. 410; State v. Barutio, 148 Mo. 249), its correctness in all other respects has never been questioned by this court. In a homicidal case, it is only when there is *no* evidence to authorize an instruction upon the particular grade of the offense upon which an instruction has been given that it will be held to be erroneous. Here there was sufficient evidence to authorize instructions upon both degrees of murder; hence, there was no error in instructing upon the lower grade of the offense, or in refusing to instruct the jury to acquit defendant of that offense. As was said by GANTT, P. J., in speaking for the court, in State v. Silk, 145 Mo. l. c. 248: "It is urged that the offense was murder in the first degree or nothing; that the court ought not to have instructed for murder in the second degree. We think the evidence shows an intentional killing with a deadly weapon, which alone raises the presumption of murder in the second degree."

The issues in this case were submitted to the jury upon instructions which covered every feature of the case and which were very fair to the defendant. They were fully justified by the facts disclosed by the record. According to the testimony of defendant himself, and all the facts connected with the homicide adduced in evidence, defendant was guilty of murder in the first or second degree, or else the killing was in self-defense. The jury found him guilty of the offense for which he was put upon trial, and we think the verdict was fully warranted by the evidence. The judgment should be affirmed. It is so ordered.

All concur.

State v. Feeley.

ON MOTION FOR REHEARING.

BURGESS, P. J.—An opinion was delivered in this case on the 31st day of January last, affirming the judgment of the trial court, in which we declined to pass upon instructions numbered eleven and fourteen for the reason that neither the record filed in this court, nor the original bill of exceptions filed with the clerk of the circuit court, showed that any complaint was made of the action of the court in giving said instructions. In motion for a rehearing, however, filed February 6th inst., our attention is called to the fact that by stipulation between counsel for the defendant and the State, filed with the clerk of this court on January 3, 1906, the motion for new trial is correctly set out in appellant's brief at pages five to eight, inclusive, which shows that the point upon the action of the court in giving all instructions in behalf of the State was duly raised by the motion. On January 4, 1906, another stipulation entered into by the same counsel, correcting the record in other respects, was also filed with the clerk of this court. The records of this court fail to show the filing of either of these stipulations, and when we came to the investigation of the case we found but one, that being the stipulation filed January 4, 1906, which referred in no way to the instructions, and it being so unusual for two different stipulations to be filed for the correction of the record in the same case, and especially without asking or obtaining the permission of the court, we overlooked the stipulation filed January 3d. It may not be out of place to say here that no record, after being lodged with the clerk of this court, can be changed without the permission of the court, duly entered of record at the time. But owing to the importance of this case we have duly considered the questions raised by counsel for defendant upon the instructions, and have modified the opinion in this respect. The motion for rehearing is overruled.

All concur.