THE STATE v. REBECCA WHITCHURCH, Appellant.—96 S. W. (2d) 30.

Division Two, June 30, 1936.

*Edgar & Matthews* for appellant.

118

*Roy McKittrick*, Attorney General, and *William W. Barnes*, Assistant Attorney General, for respondent.

LEEDY, J.—Upon a trial in the Circuit Court of Washington County appellant was found guilty of murder in the second degree, in having shot and killed one Arthur Lewis, and sentenced to a term

of twenty-five years in the State penitentiary. After an unsuccessful motion for a new trial, she has duly appealed.

On and for some months prior to August 2, 1934, the date of the alleged homicide, appellant was engaged in business at Potosi as the operator of a restaurant. She was about forty years of age, and deceased, Arthur Lewis, was about twenty years old. Shortly after noon on the day in question, she left her restaurant in company with Arthur Lewis, and they drove to DeSoto in appellant's brand new Chevrolet coupe. At the time of their departure, appellant kissed her seventeen year old daughter, who admonished her mother "to be back by dark," to which appellant replied, "I said good-bye."

At DeSoto appellant and Lewis called at the home of the latter's sister, Mrs. Eva Jackson, who testified that appellant "Didn't have very much to say, only she didn't seem to be in no hurry about getting back; he said he had a date that night. . . . She (appellant) asked him (Lewis) if Roy was going to take him, and he said, 'I don't know. I may go in that car' and she said 'not in that car. You will never go to see any girl in that car.' " She further testified that her brother said "he couldn't work since she (appellant) had that good-looking girl in the restaurant," to which appellant replied, " 'You don't need to mend your cotten breeches that girl won't never bother you.' " The witness further testified, "She seemed to be nervous. She kept raising up her dress. She had a large handkerchief in her hand and every once in a while she would raise and pull up her dress and put her hand under her arm."

The tragedy occurred in the afternoon at a point about three miles north of Potosi in what is referred to throughout the record as "an old field" adjacent to the "old DeSoto road," known also as "detour 21." Running across and over the "old field" for some distance was a byroad or lane. Near its junction with the old DeSoto road, the lane had two prongs or forks about thirty feet apart, both of which were used for public travel. Phil Jarvis, a delivery boy for a Potosi grocer, was first to arrive at the scene of the tragedy after it had occurred. He was making a delivery of groceries to the home of one Fowler, who lived nearby. He was driving a car, and left the old DeSoto road on the north prong of the byroad referred to, and went across the old field to the Fowler home. He testified he saw no car on the byroad as he went to the Fowler home. About five or ten minutes later, returning by the same route, he met appellant near her car which was in the byroad in the old field, and some fifteen or twenty feet from the old DeSoto road. Jarvis testified that appellant there told him that "two fellows shot Mr. Lewis;" that "two fellows got on the car fender and made them drive off into that old field." At that time witness observed blood on her left arm. He saw deceased "laying there on the left side of the car door twelve

or fifteen feet from the car." Appellant requested the witness to get a doctor and the sheriff. "She wanted me to help her ; . . . She said one of the boys killed Mr. Lewis." Jarvis went immediately to Potosi, reported the affair, and returned with others, when and where appellant made the same statement as to the manner in which Lewis met his death to numerous persons.

Returning to the restaurant about six o'clock that evening, appellant fainted. She was seen to have blood on her left arm near the elbow, which was washed off by one of her employees. There was also blood on her dress. She stated at that time that "somebody shot Art." One of those present at that time testified, "She grabbed me around the neck and said 'Arthur got shot.' She said 'two men jumped on the car and one of them shot him.'" Her testimony at the coroner's inquest, held the same night, was to the same effect. Before the inquest she had driven out in the country some fifteen miles to the residence of deceased's mother, to whom she made substantially the same statement, amplifying it somewhat so as to include a meager description of her son's alleged assailants, one of whom she said was a large man and the other a smaller man, and both "poorly dressed."

Lewis had been employed by appellant while she lived on a farm near Potosi, and had worked in her restaurant, but was not employed by her at the time of the shooting. There was evidence tending to show that appellant in May and June, 1934, made the statement four or five times that "If he (Art) didn't do her any good he would never do anybody else any good," and that she loved him. Further that she had made inquiries to ascertain whether "he loved any other girl." One witness testified to a conversation with appellant in May, 1934, in which she referred to the time she lived on the farm, and said: "She offered him (Lewis) her farm and everything on it if he would stay there all winter." Another testified to a conversation three or four weeks before the shooting, when Lewis was planning on going to Wyoming, and appellant asked witness to try to persuade Lewis not to go, and told the witness she would do anything to keep Lewis there.

The coroner and other medical witnesses testified to the nature and location of the wounds found upon the body of deceased. There was a bullet wound in the right side of the chest about the tenth rib. It went approximately straight through the body and came out on the left side, a little downward. There was another bullet hole in his right arm, through the axilla, into the chest, and across to the left shoulder. The bullets entered the body from the right side. Around the lower opening and on the arm was quite an area of powder burns. Either of the wounds would have produced death. There was also opinion evidence to the effect that the muzzle of the gun was within

two to six inches of the body of deceased when the fatal shots were fired, and that he was in a sitting posture.

Appellant was the only eyewitness to the shooting. She took the stand in her own behalf, and stated her version of the affair, in substance, as follows: That in returning from DeSoto, she and Lewis had driven some distance into the old field referred to, when they turned around and returned to a large tree, where they stopped the car. The day was hot, and she opened the car door on her side. She put her feet outside, and leaned back against the side of the car and over against Lewis. A discussion followed with reference to his borrowing her car that night, and appellant refused to let him have it unless her daughter, Evelyn, accompanied him. About that time Phil Jarvis was seen traveling in a car on the lane or byroad headed in the direction of the Fowler place, and a controversy arose between Lewis and appellant over Phil Jarvis, in which Lewis became angry. Appellant testified that, suddenly and without warning, Lewis started the car, causing the open door thereof to strike her on the foot or ankle with considerable force; that Lewis then struck her on the back and shoulder and tried to knock her out of the car; that she said, "Art, what is the matter with you?" To which Lewis made no reply. The car was traveling fast, and when about halfway between the place where they had parked and where the car finally came to a stop, the car gave a jerk, and leaned over on its side like it was going to turn over, and thereafter Lewis drove even faster. To quote appellant's own testimony:

"Q. What did he do then? A. Well, he was driving real fast and he started to hit me on the back here and tried to knock me out of the car, and I said, 'Art, what is the matter with you,' and he didn't say anything then. He had already said he was going to knock me out of the car and kill me and take the car and leave and I knew he would do it.

"Q. You say he told you he was going to kill you? A. Yes, sir, and throw me out of the car, and take the car and leave, and I says, 'Art, what in the world is the matter with you?'

"Q. Then what did he do? A. He didn't do anything until the car stopped.

"Q. How come the car to stop? A. I pulled the key out of the ignition. . . . I don't know whether I threw the key down on the floor or whether it fell down there or what went with the key.

"Q. Then what happened? A. Then he turned around toward me and grabbed hold of my arm, and he says, "damn you, you will stop me won't you?' and I said, 'Art, what in the world is the matter with you?'

"Q. He grabbed you by the arm, and says, 'damn you, you will stop me?' A. Yes, sir, and he grabbed hold of my arm.

"Q. What else did he do? A. He grabbed me by this arm (indicating), and I turned around and I said, 'Art, what in the world is the matter with you,' and just then when he turned around toward me he reached up in the back of the seat, and just at that minute I thought of the gun. He had already told me he was going to kill me.

"Q. Had he struck you before that? A. Yes, sir.

"Q. When did he strike you? A. Just before the car stopped.

"Q. Where did he strike you? A. He struck me once right here and once right here and on my shoulder. . . .

"Q. Now, when the car came to a stop what did he do? A. He reached for the gun. When I asked him what was the matter he turned around and reached for the gun with his left hand. The gun was laying up there in that place behind the seat kind of up in the corner there close to me, and when he reached for the gun I thought of the gun and I grabbed it before he did. I grabbed the gun with my right hand and when I grabbed the gun he reached over and grabbed it. That is when he scratched my hand. It seemed like he grabbed the gun with his right hand. He had hold of my right arm with his left hand, and I says, 'Arthur, my God, don't do that. You can't do that.' I says, 'You are going to kill me.' And when I said that, he was leaning over a little and he was pulling on the gun and I was trying to keep him from getting it. I pushed the gun down in my lap and was holding it with both hands, like this (indicating), and he got his hand under the end of the barrel, and just as I said that, 'You can't do that,' he give a big jerk. He was leaning over a little or he might have been straight then, and when he give that jerk I heard the gun fire, and I saw blood coming down there on my arm and it run down on my dress, and the minute he was shot he jumped out of the car on his side and threw his arms up. He didn't run, he just kind of fell out of the car and took four or maybe five steps and it looked like he just went out there and laid down there and put his arms up kind of under his face like this (indicating), and said, 'Becky, come here.'

"Q. Then did he die? A. Yes, sir, but I didn't know he was dead until the Doctor told me.

"Q. Did you purposely or intentionally shoot Arthur Lewis on the 2nd day of August, 1934? A. No, sir.

"Q. Do you know how many times the gun fired that day? A. I just heard the noise is all. I don't know how many times it went off. It was just all at the same time.

"Q. At the exact instant that this gun was discharged did you and Arthur Lewis both have hold of this gun? A. I don't think I did. We both had hold of the gun. I had it down in my lap like this (indicating), and he had hold of the end of the barrel, and just as

I looked at him he give a big jerk. Just as he did that, I said, 'Arthur, you can't do that.' Just as I said that the gun fired. I know he pushed this hand off but I won't say whether this other hand was off at the time the gun went off or not. Just as I said, 'You can't do that,' he jerked up on the gun and the gun fired, and when he was shot he jumped or kind of fell out of the car. He didn't run he just walked over there from the car four or five steps and laid down. It just looked like he walked over there and laid down, and then he called me."

Appellant admitted she may have made the statement that she and Lewis were forced to drive into the old field by two men, who jumped on the running board of their car, but she denied having said that they shot Lewis. She introduced testimony tending to establish her good reputation for honesty, morality and truthfulness prior to the date of the alleged homicide.

The court instructed on murder in the first degree, murder in the second degree, and manslaughter. It also instructed on the law of self-defense, and, at appellant's request, gave an instruction submitting the theory of accidental killing. Other instructions embraced the following subjects: reasonable doubt and presumption of innocence, circumstantial evidence, good character and credibility of witnesses.

I. The first point relates to an alleged error in allowing appellant insufficient time in which to make her peremptory challenges. Inasmuch as the record does not indicate the length of the period allotted for that purpose, and fails to show any objection thereto, and being raised for the first time in the motion for new trial, comes too late, and is, therefore, not open for review.

II. The court refused to give instructions 19 and 23 requested by appellant, and this action is made the basis of the second and fourth assignments of error. It is argued that she was entitled to said instructions because they were the converse of the State's main instruction (No. 3) submitting the hypothesis of murder in the second degree. State's Instruction No. 3 reads as follows: "The court instructs the jury that bearing in mind the foregoing definition, if you find and believe from the evidence in this cause, that at the County of Washington and State of Missouri, that on or about the 2nd day of August, 1934, the defendant, Rebecca Whitchurch, without just cause or provocation and under such circumstances as not being justifiable or excusable homicide and not in the lawful defense of her person, as such defense is explained in another instruction given herein, did willfully, premeditatedly and of her malice aforethought, but not deliberatedly, shoot and kill one Arthur Lewis, you

will find the defendant guilty of murder in the second degree and assess her punishment at imprisonment in the penitentiary for a term of not less than ten years.''

Refused instructions 19 and 23 are, respectively, as follows: (No. 19) ''The court instructs the jury that before you can find the defendant guilty of murder in the second degree, the State must prove by evidence to your satisfaction and beyond a reasonable doubt that the defendant willfully, feloniously, premeditatedly and of malice aforethought did shoot and kill Arthur Lewis.'' (Then follows definitions of the terms ''willfully,'' ''premeditatedly,'' ''malice,'' etc., in the same language as contained in State's Instruction No. 1.)

(No. 23) ''The court further instructs the jury that before you can convict the defendant in this case of second degree murder you must find and believe beyond a reasonable doubt that she premeditatedly and of her malice aforethought shot and killed the deceased, Arthur Lewis, and that such shooting did not appear then and there necessary in her defense, or that said shooting was not the result of an accident, and unless you so find you must acquit the defendant.''

Upon formulating a correct declaration of law and requesting the court to give it, a defendant is entitled to the converse of the State's principal instructions, and it is reversible error to refuse such converse instruction, unless the State's instructions clearly submit the converse of the facts and issues upon which convictions are authorized. [State v. Ledbetter, 332 Mo. 225, 58 S. W. (2d) 453, and cases there cited.]. The language of Instruction No. 3, ''without just cause or provocation and under such circumstances as not being justifiable or excusable homicide and not in the lawful defense of her person,'' when taken in connection with the whole instruction, constituted a sufficient submission of the converse of the issues authorizing a conviction of murder in the second degree. In fact, we deem the State's instruction as more favorable to appellant than those formulated by her. It was, therefore, not error to refuse her requested instructions, 19 and 23, and so it becomes unnecessary to determine whether they were otherwise correct declarations of law.

III. Complaint is made of the refusal of Instruction No. 21 which submitted the hypothesis of accidental killing. This phase of the case was fully covered by Instruction No. 7, given at appellant's request, and so there was no error in refusing said instruction.

It is also charged that it was error to refuse Instruction No. 26 on the issue of self-defense, because State's Instruction No. 5 on that subject ''did not properly declare the law.'' The grounds of the motion for new trial with respect to this matter are too general, and preserve no question for review. However, it was properly re-

fused in any event, for the reason there was no issue of self-defense in the case, as will be pointed out in connection with the discussion of other alleged errors.

By Instruction 12 the court instructed on the law of presumption of innocence and reasonable doubt. It was in approved form. It is urged that it was error to refuse appellant's Instruction No. 27 because it was the converse of Instruction No. 12. There is no merit in the contention, because the converse instruction rule being limited to main or "recovery" instructions, does not apply to instructions of the type here involved.

IV. The point is made that the court erred in permitting blood-stained garments of the deceased to be exhibited to the jury. The assignment is not supported by the record. While the undertaker was testifying, the State attempted to identify certain clothing as having been worn by deceased at the time of his death. The State was unable to qualify its witness, and upon objection by appellant, the court ruled: "Gentlemen of the jury you will not take this as any testimony. There has been no testimony that these are the same clothes. Therefore, you will not consider it as any testimony. And any testimony that is objected to and sustained by the court and which is stricken from the record will not be considered by you in arriving at your decision." Apparently appellant was satisfied therewith, as no exception was saved to such ruling.

V. This brings us to a consideration of the most serious question presented by the record in this case. Appellant offered to prove statements and threats made by deceased against her life immediately prior to the shooting. Upon objection by the State, this proffered testimony was excluded. The error assigned in this respect is limited by the motion for a new trial to a single proposition—namely, that said statements and threats were "admissible on the question of self-defense." Now, the State asserts that appellant is in no position to complain, notwithstanding the several adverse rulings when the offers were made and upon motions to strike, inasmuch as it appears that in her own testimony "defendant was permitted to tell all that was said, and what was done immediately prior to the shooting." In other words, that the court, after ruling adversely to appellant, concluded it was competent and admitted it. We do not so construe the record, although it is true that in her direct examination she did finally succeed in injecting references to the threats, which do not appear to have been stricken on motion. However, we do not base our ruling on that ground, but upon the broader proposition that there was no self-defense in the case. It is true the court submitted

that issue, but it was something to which appellant was not entitled, under the facts of this record, and was error against the State.

By her own testimony appellant sought, not to justify the killing, as in self-defense, and so entitle her to an acquittal on that ground, but on the contrary, to establish such facts and circumstances as would bring the killing within the purview of Section 3986, Revised Statutes 1929 (Sec. 3986, Mo. Stat. Ann., p. 2792), as having been committed by accident or misfortune and, therefore, excusable. Taking human life in self-defense is an affirmative, positive, intentional act (State v. Gordon, 191 Mo. 114, 89 S. W. 1025, 109 Am. St. Rep. 790; State v. Feeley, 194 Mo. 300, 92 S. W. 663, 3 L. R. A. (N. S.) 351, 112 Am. St. Rep. 511) and the law does not recognize the anomalous doctrine of accidental self-defense. [State v. Smith, 114 Mo. 406, 21 S. W. 827.] The case is unlike the line of which State v. Haines, 160 Mo. 555, 61 S. W. 621, is typical, wherein defendant contends one moment he shot deceased in self-defense and the next that it was wholly accidental. Appellant was the only eyewitness, and her testimony directly negatives an intent on her part to inflict the wound defendant received, and furthermore no claim was made that she thought it necessary to use a deadly weapon. In fact she disclaims having used it, the effect of her testimony being that the gun was not in her hands at the time the fatal shots were fired. See State v. Singleton (Mo.), 77 S. W. (2d) 80, holding defendant not entitled to an instruction on self-defense under analogous facts. Having held there was no self-defense in the case, it follows it was not error to exclude the proof of threats, insofar as the admissibility thereof is dependent on the presence of that issue, as alleged in the motion for new trial.

VI. The next point is that error was committed in permitting the State to show by the witness Bert Elliott, a statement made by appellant at the coroner's inquest. Such statement was to the effect that two men jumped on the side of the car, and one of them reached for her pocketbook, and one of them shot deceased. The inquest was held on the same day, and within a few hours after the shooting. She was not under arrest at the time, nor charged with any offense. The case of State v. McDaniel, 336 Mo. 656, 80 S. W. (2d) 185, is the most recent expression of this court on the subject. The authorities are there fully discussed and analyzed. It approves the holding that "The test as to the admissibility of this character of testimony is no longer whether it was made in a judicial proceeding under oath, but was it voluntary? If so, then it was admissible, otherwise, not." But we deem it unnecessary to inquire into the particular facts attending appellant's role as a witness before the coroner's jury, in the light of the objection interposed, which went only

to the proposition that appellant "was not apprised of her constitutional rights, and was not told she had the right to consult counsel, and was not informed that anything she might say on that occasion might be used against her." It appears from the testimony of some six or seven witnesses that appellant made substantially the same statement to them before the inquest was held. This evidence was received without objection. In this situation, even if the court erred in its ruling, it would not work a reversal of the case.

VII. No complaint was made in the motion for new trial that there was no substantial evidence to support the verdict, although assigned under appellant's points and authorities. It is not developed in the argument and brief. If the question were properly before us, it would necessarily be determined adversely to appellant in the light of the facts hereinabove enumerated. We have examined the record proper, and find it regular and sufficient. The judgment should be affirmed. It is so ordered. All concur.